# FITCHBURG GAS AND ELECTRIC LIGHT COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. March 6, 1985. — May 3, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Department of Public Utilities. Public Utilities*, Judicial review, Financing. *Administrative Law*, Judicial review. *Electric Company. Due Process of Law*, Public utilities.

A decision by the Department of Public Utilities under G. L. c. 164, § 14, denying an electric company's request for approval of a proposed issue of its preferred stock, pending completion of an investigation by the department of the company's role as a joint owner of the Seabrook Nuclear Project, presented a final decision amenable to judicial review under G. L. c. 25, § 5, despite the department's styling of its decision as interlocutory. [676-677]

Discussion of the duty of the Department of Public Utilities under G. L. c. 164, § 14, to determine whether a proposed issuance of securities by a public utility company is "reasonably necessary." [677-679]

In view of the broad investigative powers of the Department of Public Utilities, it was neither an error of law nor an abuse of discretion for the department to deny approval of a proposed issuance of securities by a public utility company, pending completion of an investigation of the company's role as a joint owner of the Seabrook Nuclear Project, where the department was warranted in finding, on the record before it, that no financial emergency existed which required it to act before the investigation was completed and that it would be impossible to restrict the use of the proceeds of the proposed financing to projects unrelated to Seabrook. [680-681]

A decision of the Department of Public Utilities denying approval under G. L. c. 164, § 14, of an electric company's proposed issuance of securities, pending completion of an investigation of the company's role as a joint owner of the Seabrook Nuclear Project, raised no due process issue, either because based on an unheralded change in the legal standards for such approval or because the possible loss of a favorable financing opportunity amounted to confiscation of the company's property, and did not deny the company equal protection of the laws. [681-682]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 7, 1985.

The case was reported by *Abrams, J.*

*Paul K. Connolly, Jr.* (*Adrienne Markham & Elias G. Farrah* with him) for the plaintiff.

*Thomas A. Barnico*, Assistant Attorney General, for the defendant.

ABRAMS, J. The Fitchburg Gas and Electric Light Company ( Fitchburg or company) asserts that the Department of Public Utilities (DPU or department) has improperly denied the company's requests for long term financing pending the department's completion of its investigation, pursuant to G. L. c. 164, § 14,[1] of Fitchburg's role as a joint owner in the Seabrook Nuclear Project, Unit I (Seabrook I). The company seeks an order requiring immediate approval of its proposed interim financing. We conclude that the decision of the department to deny financing pending the outcome of the department's "generic" proceeding should be affirmed.

We summarize the facts. Seabrook I is a 1,150 megawatt power plant under construction by Public Service Company of New Hampshire in Seabrook, New Hampshire. Fitchburg is a retail electric company serving approximately 23,000 customers in the city of Fitchburg and surrounding communities, and owning 0.86519 per cent of Seabrook I. Fitchburg did not

---

[1] General Laws c. 164, § 14, as amended through St. 1977, c. 258, § 2, provides in pertinent part: "Gas and electric companies shall issue only such amount of stock and bonds, and of coupon notes and other evidences of indebtedness payable at periods of more than one year after the date thereof, as the department may from time to time vote is reasonably necessary for the purpose for which such issue of stock, bonds, coupon notes or other evidences of indebtedness has been authorized. The department may take into consideration any resources of the companies available or which might have been available for said purpose. The department shall render a decision upon an application for such issue within thirty days after the final hearing thereon. The decision shall be in writing, shall assign the reasons therefor, shall, if approving such issue, specify the respective amounts of stock, bonds, coupon notes or other evidences of indebtedness which are approved to be issued for the respective purposes to which the proceeds thereof are to be applied, and shall, within seven days after it has been rendered, be filed in the office of the department."

394 Mass. 671                                          673

Fitchburg Gas & Electric Light Co. *v.* Department of Public Utilities.

seek, nor was it required to seek, department approval to become a joint owner in the Seabrook project.

On February 21, 1984, Fitchburg filed a petition with the DPU pursuant to G. L. c. 164, § 14, for the approval of the issue of up to $5 million of preferred stock and of up to $13 million of long term notes. The Attorney General intervened under G. L. c. 12, § 11E. The company filed its testimony in support of the petition on March 12, 1984. Discovery proceeded through April, and the DPU held hearings on May 16, 18, 22, 25 and 30. On May 30, 1984, Fitchburg obtained a six-week suspension of hearings on its financing proposal to flesh out the record "in order for the company, the intervenor, the Attorney General, and the Department to better evaluate . . . the prime concern of the Department, and that is the viability of the Seabrook project."

On July 9, 1984, Fitchburg moved to recommence hearings and for expedited approval of its petition, subject to the condition that proceeds from the proposed financings would be used only to repay short-term debt outstanding and pre-Newbrook[2] commitments. The department ordered the recommencement of hearings, but denied the motion for immediate approval of financing. On July 13, 1984, Fitchburg, together with the Massachusetts Municipal Wholesale Electric Company, Canal Electric Company, and New England Power Company jointly requested that the department initiate a generic proceeding to examine the cost and schedule of Seabrook I. The department approved the companies' petition on August 7, 1984, and established a new docket to investigate the Seabrook I project. The findings from the generic proceeding were to be incorporated into the pending and prospective financing proceedings of the petitioning companies, including Fitchburg.

On August 21, 1984, Fitchburg requested approval to issue only the $5 million of preferred stock, suggesting that approval of the issuance of $13 million of long term notes could be

---

[2] Newbrook is a plan approved on May 14, 1984, by the joint owners of the Seabrook project which established new financing mechanisms through which joint owners can satisfy their Seabrook obligations.

deferred pending a decision in the Seabrook generic proceeding. On October 11, 1984, the president of Fitchburg wrote a letter to the chairman of the DPU, stressing the seriousness of the company's cash situation. In response, the department scheduled a hearing on October 17, 1984.

On October 26, 1984, the department denied the company's motion for immediate approval of the $5 million issue of preferred stock. The department found that "Fitchburg [had] not demonstrated that a financial emergency exist[ed], or that such an emergency, if it did exist, would justify a departure from the Department's previously established standards in this area." With respect to the alleged financial danger, the department found that, on the basis of "pessimistic" assumptions, the company projected cash requirements which would "exceed its present short-term debt levels only slightly and for a very short period." That forecast, moreover, assumed "no increase in the Company's present level of short-term credit lines, even though the Company has pending requests with two banks for approximately $5,000,000 of additional short-term credit."

The DPU's order cited the department's "clear obligation under G. L. c. 164, § 14, to make a determination as to the reasonableness both of the Seabrook construction program and the Company's continued participation in that project" before approving any "financings which will be used to support it." Fitchburg, the department found, was unable to ensure segregation of funds because of its corporate structure. Thus, "[o]nly if the Company ceased making [Seabrook-related] payments could the Department be assured that the proceeds of any financing which it might authorize would not be used for a purpose, the reasonableness of which is a matter of pending litigation before the Department."

Although the DPU issued an opinion and findings in conjunction with its October 26, 1984, order, the company took no immediate appeal. On November 7, 1984, the company moved for reconsideration of the DPU's order of October 26. Fitchburg offered to place the $5 million preferred stock proceeds in escrow, so that they could not be used to finance the Seabrook project. The DPU rejected Fitchburg's proposal and denied the

394 Mass. 671                                     675

Fitchburg Gas & Electric Light Co. v. Department of Public Utilities.

motion, stating that "[w]hat is critical is that whatever financial benefit that will accrue to the Company because of the presence of the escrow account could, in part, be used to support the Seabrook project as long as the Company continues to make such payments."

In compliance with the department's order, the company submitted further testimony regarding Seabrook I. On January 18, 1985, the Attorney General moved to extend the schedule of the generic proceeding. Fitchburg opposed the motion and reinstituted its request for expedited approval of financing. On January 25, 1985, the department approved a delay in the procedural schedule without mention of Fitchburg's financing request. During an evidentiary hearing on January 31, 1985, the hearing examiner informed the parties that the company's motion for immediate approval of financing had been implicitly denied in the department's January 25, 1985, scheduling order.

The company then appealed to a single justice of this court under G. L. c. 25, § 5, claiming that the DPU's orders had placed it in a financial crisis. The company introduced an affidavit showing that its level of short term debt had exceeded $17 million by the end of 1984, and thus lay perilously close to the limit the company asserts the banks had imposed; that the company had omitted a common stock dividend for the first quarter of 1985; and that the market value of its common stock had dropped from "nearly $18 per share on October 17, 1984 to $9.375 per share in February, 1985, as compared to a book value per share of $21.60." The single justice, after hearing, reserved and reported the appeal to the full court without decision, at the parties' request.

On March 7, 1985, we issued an order stating that the denial by the DPU on January 31, 1985, of the company's application for approval of an issue of preferred stock was "a final order under G. L. c. 25, § 5."[3] The DPU was to "submit in writing

---

[3] The DPU regarded its order of January 31, 1985, as an interim order and therefore did not file a statement of its reasons for that decision as required by G. L. c. 164, § 14. The company asked us to treat the order as a final order. We did so and gave the department the opportunity to submit a statement of reasons in compliance with the statute.

to this Court by March 15, 1985: (1) a statement of the reasons for its denial on January 31, 1985, of the plaintiff's application for approval to issue up to $5,000,000 of preferred stock, see G. L. c. 164, § 14; and (2) an explanation of how the DPU's decision in the generic proceeding regarding the Seabrook project might relieve the plaintiff of its contractual obligations with respect to the Seabrook project." In its response, the department stated that "Fitchburg's motion of January 25, 1985, was denied because the Company failed to demonstrate that it is facing a financial emergency and that approval of its financing request is warranted before the Department finds, in accordance with G. L. c. 164, § 14, that . . . continued participation in the Seabrook project is at this time and under current circumstances reasonably necessary." The department specifically found that Fitchburg's cash flow situation had improved since the DPU had last rejected its claim of financial emergency on October 26, 1984. By eliminating a common stock dividend, the company had preserved $460,000 with which to meet short term debt. The company had further benefited from the department's grant of early rate relief: On November 29, 1984, the department approved a $3 million rate increase for Fitchburg, effective December 1, 1984. *Fitchburg Gas & Elec. Light Co.,* D.P.U. 84-185 (November 29, 1984). In short, the DPU found that "the Company's cash flow calculations demonstrate that Fitchburg's claims of impending disaster because of the lack of credit have no basis in fact."

On appeal, Fitchburg claims error only in the DPU's decisions, orders, and rulings of October 26, 1984, November 9, 1984, January 25, 1985, and January 31, 1985, denying the company authority to issue long term financing. No issue regarding the propriety of the generic proceeding is before us.[4] The threshold question is whether we have jurisdiction over the claims of Fitchburg presented in the reservation and report.

---

[4] The department rendered its decision in the generic proceeding on April 4, 1985. We express no view regarding that decision, but rather confine ourselves to the issues raised only with respect to the department's denials of Fitchburg's requests for interim financing.

394 Mass. 671                                                677

Fitchburg Gas & Electric Light Co. *v.* Department of Public Utilities.

We conclude that we have such jurisdiction and that its exercise is appropriate in the instant circumstances.

General Laws c. 25, § 5, as amended through St. 1977, c. 621, provides in pertinent part that "[a]n appeal as to matters of law from any *final* decision, order or ruling of the commission may be taken to the supreme judicial court by an aggrieved party in interest by the filing of a written petition praying that the order of the commission be modified or set aside in whole or in part" (emphasis supplied). The finality of an order is to be determined "on the footing of its substance and not of its name." *Check* v. *Kaplan*, 280 Mass. 170, 176 (1932). Despite the DPU's styling of its denial of financing as interlocutory, we believe that the denial of the company's request for immediate financing should be considered final within the meaning of G. L. c. 25, § 5.[5]

The department's ruling, the company claims, places the company between the Scylla of suspending its contractual payments on the Seabrook project in order to obtain interim financing, thus subjecting the company to liability for breach of its contractual obligations; and the Charybdis of forgoing interim financing and bearing the risk of exceeding the limit on its short term credit. The company urges that the disputed orders of the department: (1) are an error of law under G. L. c. 164, § 14; (2) either constituted an abuse of discretion or were arbitrary or capricious under G. L. c. 30A, § 14 (7)(*g*); (3) denied the company due process; (4) have resulted in an impermissible confiscation; and (5) denied the company equal protection under the law. We address each challenge in turn.

The company contends that G. L. c. 164, § 14, while authorizing the department to investigate a public utility's construction project, does not permit the DPU to deny long term financing needed for capitalizing utility plant in service unrelated to that construction program. Fitchburg asserts that, since the company's last stock issuance in October, 1983, it has

---

[5] Because we hold that this appeal is properly before us under G. L. c. 25, § 5, we do not reach the company's claims of jurisdiction under G. L. c. 211, § 3, and G. L. c. 231A.

spent more than $5 million on capital projects other than Seabrook and on the retirement of matured debt. The provision of utility plant in service to gas and electric customers, the company argues, is a "purpose having to do with the obligations of the company to the public," *Lowell Gas Light Co.* v. *Department of Pub. Utils.*, 319 Mass. 46, 52 (1946), and is thus "reasonably necessary" within the meaning of G. L. c. 164, § 14. The company maintains that the DPU erred in refusing to isolate a determination of the "reasonable necessity" of Fitchburg's uncontroverted expenditures from investigation of the necessity of the Seabrook project, and in refusing to approve at least the issuance of $5 million in preferred stock to refinance the undisputed outlays. We disagree.

The manifest purpose in enacting G. L. c. 164, § 14, was "to change the whole method of the issue of stock by the public service corporations therein named, and to take away from such corporations and to vest in public officers the right to determine the general question of the reasonable necessity of the issue. And the decision of the [department] is final unless based upon some error of law." *Fall River Gas Works* v. *Gas & Elec. Light Comm'rs*, 214 Mass. 529, 538 (1913). We have held, moreover, that the department's duty under G. L. c. 164, § 14, goes well beyond a perfunctory review of a company's proposed financing. "[T]he department must inquire whether the declared purpose of the proposed issue is in fact in the circumstances a reasonably necessary purpose. And having in mind that the function of the department is the protection of public interests and not the promotion of private interests, we think that 'reasonably necessary' means reasonably necessary for the accomplishment of some purpose having to do with the obligations of the company to the public and its ability to carry out those obligations with the greatest possible efficiency. . . . [T]he burden of proof [is] upon the [company] to establish a reasonable necessity of this kind." *Lowell Gas Light Co.*, *supra*. A proceeding pursuant to G. L. c. 164, § 14, is meant to serve as a screening mechanism "to shield the public from the effects of management's unchecked discretion in the limited realm of capital spending projects that are so large in relation

to the company's internal funds as not to be sustainable without external financing." *Pennsylvania Pub. Util. Comm'n* v. *Philadelphia Elec. Co.*, 501 Pa. 153, 161 (1983).[6]

Other features of the statute support the conclusion that the Legislature meant the department to exercise considerable influence in utility securities issuance. The department may hold hearings on an issuance application. See. G. L. c. 164, § 14. It may specify the amounts of financing authorized for each approved purpose. *Id.* If the department finds the price of the proposed stock to be "so low as to be inconsistent with the public interest . . . it may fix the price at which such shares may be issued." G. L. c. 164, § 18, as appearing in St. 1977, c. 259, § 3. See *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 333 Mass. 536 (1956). Absent department approval, an issue is void. *Attorney Gen.* v. *Massachusetts Pipe Line Gas Co.*, 179 Mass. 15, 21 (1901).

These powers are merely representative of the department's broader investigative and supervisory authority over gas and electric companies. "The department shall have the general supervision of all gas and electric companies and shall make all necessary examination and inquiries and keep itself informed as to the condition of the respective properties owned by such corporations and the manner in which they are conducted with reference to the safety and convenience of the public . . . ." G. L. c. 164, § 76, as amended by St. 1982, c. 120, § 6. This grant of authority subtends the department's power to supervise a utility's dealings with its affiliates, see G. L. c. 164, § 76A; to examine company records, G. L. c. 164, § 85; to investigate and adjust prices and to order improvement in service, G. L. c. 164, § 93; and to investigate the propriety of rate increase requests, G. L. c. 164, § 94.

---

[6] Agency review of utility securities issues has been restricted in other jurisdictions. See, e.g., *Attorney Gen.* v. *Michigan Pub. Serv. Comm'n*, 412 Mich. 385 (1982); *Appeal of Pub. Serv. Co.*, 122 N.H. 1062 (1982); *Public Serv. Co.* v. *State*, 645 P.2d 465 (Okla. 1982). But neither the language of G. L. c. 164, § 14, nor our earlier interpretations of that provision are consistent with a limited view of the power of the department to intercede with respect to a utility's capital spending programs when these are of such magnitude as to require special securities financing. See *Attorney Gen.* v. *Michigan Pub. Serv. Comm'n, supra* at 406-407.

In view of the department's broad investigative powers, its refusal to approve Fitchburg's requests for interim financing was not an error of law. "Where agency action is irrational, we will find an error of law. See *Southbridge Water Supply Co.* v. *Department of Pub. Utils.*, 368 Mass. 300, 308-309 (1975). But, as we have said and ruled in a variety of contexts, questions of policy are for an administrative agency." *Attorney Gen.* v. *Department of Pub. Utils.*, 390 Mass. 208, 228 (1983). The department has a range of discretion under the enabling legislation.[7] "Whether the issue was reasonably necessary for the business of the company, that is, to enable it to carry on efficiently the public service of supplying gas, was a question for the department and not the court to decide." *Lowell Gas Light Co.*, *supra* at 53. It also is the department's prerogative to determine whether an appropriate investigation entailed postponement of decisions on Fitchburg's financing requests until the decision in the generic proceeding was reached.

Having established that the department had discretion to deny Fitchburg's interim requests, we conclude that the denials were not an abuse of that discretion. The department consistently found no financial emergency requiring agency action before completion of the generic proceeding. The company's cash flow chart demonstrated that at no time through the end of 1984 did the company's short term debt level exceed the limit of $18 million imposed on the company by the banks, nor

_____

[7] The department describes the contours of its authority as follows: "Ordinarily, if a company establishes a reasonable utility purpose for the proposed financing and there is no issue whether a reasonable decision-making process underlies the management decisions that have prompted the requested financing, then the Department has a sufficient basis to approve it as being reasonably necessary without scrutinizing the economics or prudence of the underlying purpose of the financing. . . . Except in extraordinary circumstances, the Department will defer to the management decisions of the utility.

"Where extraordinary circumstances raise serious questions regarding the efficacy of the purpose for the financing or the adequacy of management's decision-making process, however, the Department's level of review must be more detailed. . . . Specifically, such a review must be undertaken when the extraordinary circumstances have the potential to bring about a substantial adverse impact on the public interest."

did the company project that it would exceed that limit through the end of April, 1985. The company had been granted early rate relief, effective December 1, 1984. "[T]he department's decision was reasonable in its analysis and thus not arbitrary or capricious and . . . there was substantial evidence to support its findings." *Attorney Gen.* v. *Department of Pub. Utils., supra* at 228.

"We will not substitute our judgment for that of the department on disputed questions of fact." *Costello* v. *Department of Pub. Utils.,* 391 Mass. 527, 533 (1984). The department found each time that it would be impossible to restrict the proceeds of the proposed financing to uses unrelated to Seabrook. "Deference is owed the department's expertise and experience in the areas of decision-making delegated to it by the Legislature." *Attorney Gen.* v. *Department of Pub. Utils.,* 392 Mass. 262, 263-264 (1984). While the company may have presented "logical reasons, with supporting evidence, for arriving at conclusions contrary to the department's conclusions on particular issues," *Attorney Gen.* v. *Department of Pub. Utils.,* 390 Mass. at 228, it simply did not meet its burden to convince the department of the necessity of immediate financing.

The company's three allegations of constitutional error fare no better. First, in light of the legitimacy of the Seabrook inquiry pursuant to G. L. c. 164, § 14, there is no basis for the company's claim that the department's denial of interim financing and insistence on an extended investigation were based on so unheralded a "change in legal standards" as to implicate the due process clause. We add that Fitchburg, along with other joint owners in the Seabrook project, requested that the DPU initiate the generic proceeding. Second, the company's claim of confiscation devolves to a prediction that "[i]f . . . financial deterioration continues, it could . . . render the Company unable to attract capital on favorable terms." "But the forecast is a speculative and unqualified one; against it are to be set the beneficial objects of [G. L. c. 164, § 14] as the department might see them." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.,* 363 Mass. 474, 498-499 (1973). "[I]t is not enough . . . to allege confiscation in the hope that

this court will disagree with the particulars of a complex decision and will supplant it with another more to the Company's liking." *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 10, cert. denied, 439 U.S. 921 (1978). Fitchburg's allegation of confiscation is especially unpersuasive in light of the expedited $3 million rate increase which the company received in its last rate case. See *Fitchburg Gas & Elec. Light Co.*, D.P.U. 84-145 (November 29, 1984). Third, as for the company's equal protection claim, Fitchburg has simply not sustained its burden of "affirmatively show[ing] that no factual situation can be conceived that will support the reasonableness of the differential treatment of like entities."[8] *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 376 Mass. 294, 312 (1978).

We are not unsympathetic to the company's situation. "Long delays are inappropriate in a securities issue proceeding. The utility's decision to issue securities, its determination of the

---

[8] We are unpersuaded that the three department decisions cited by Fitchburg demonstrate a violation of equal protection. In *Eastern Edison Co.*, D.P.U. 84-123 (August 22, 1984), the department approved the financing request of Eastern Edison Company. But Eastern Edison Company, unlike its subsidiary, Montaup Electric Company, had no investment in the Seabrook program. The department was able to restrict the proceeds of the financing to uses unrelated to Montaup. Hence, there was no possibility that the proceeds would be applied to Seabrook. In *Massachusetts Mun. Wholesale Elec. Co.* (MMWEC), D.P.U. 1627-Phase I (January 11, 1985), the DPU partially granted MMWEC's bonding request in order to avoid "rate shock" were MMWEC to begin billing participants in the Seabrook project for interest payments on outstanding obligations associated with the project. MMWEC, unlike Fitchburg, "is a public power corporation with no stockholders to bear the risks associated with power plant construction." *Id.* at 29. Last, the department, in *Canal Elec. Co.*, D.P.U. 1657 (December 9, 1983), found "exigent circumstances" demanding approval of the company's proposed financings. The department balanced the "substantial risk of loss of savings" against "substantial questions raised by the state of the record and the Attorney General's arguments which require further inquiry." *Id.* at 12. The company's use of the proceeds from the equity sale was restricted "to be initially available only to meet the minimum debt/equity ratio requirements of the company's bond indenture." *Id.*

We stress that it would behoove the parties to file with the court copies of DPU decisions on which they rely. Cf. *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 376 Mass. 294, 305 n.5 (1978).

optimal combination of securities to be issued, and the [department's] review of those decisions all are premised on the conditions prevailing in the financial markets at the time the utility decides to seek additional financing. If there is a long delay between the utility's decision and the actual issuance of the securities, conditions in the financial markets may change considerably. A propitious time to issue securities may be lost, and the utility's evaluation of the best combination of securities and the [department's] review, along with any appeals, are outdated." *Attorney Gen.* v. *Michigan Pub. Serv. Comm'n,* 412 Mich. 385, 415 (1982). On the other hand, we are loath to disturb a legislative scheme designed "to hinder a utility from falling victim to imprudent capital spending programs which are of such great magnitude as to imperil the company's continued viability. . . . While this is a severe intrusion upon matters that, in an unfettered, competitive, free enterprise economy, would normally be within management's dominion, public utilities are not models of competitive behavior, and, as monopolies, have been subjected to a uniquely comprehensive regulatory scheme." *Pennsylvania Pub. Util. Comm'n* v. *Philadelphia Elec. Co.,* 501 Pa. 153, 160-161 (1983).

Judgment should be entered in the county court affirming the department's denials of interim financing to Fitchburg through January 31, 1985.

*So ordered.*