MUNICIPAL LIGHT COMPANY OF ASHBURNHAM & others[1]
*vs.* COMMONWEALTH & others.[2]

No. 91-P-910.

Suffolk. November 12, 1992. - February 25, 1993.

Present: BROWN, KASS, & IRELAND, JJ

*Practice, Civil,* Complaint, Motion to dismiss. *Electric Company. Estoppel. Contract,* Implied. *Commonwealth,* Claim against. *Constitutional Law,* Constitutional challenge by government agency, Impairment of contracts. *Eminent Domain,* What constitutes taking. *Corporation,* Stocholder's derivative suit.

The Commonwealth was not liable to certain municipal light companies that had invested in the Seabrook Nuclear Power Plant Unit 1 on a theory that the Commonwealth was estopped to deny an implied contractual obligation to support the Seabrook project and to refrain from acting to impede it, inasmuch as principles of estoppel are not applicable against the government in connection with the exercise of its public duties and where, moreover, the statutes and administrative decisions in connection with the project did not provide a reasonable basis for a conclusion that the Commonwealth was unconditionally committed to Seabrook; therefore the utilities' claims were correctly dismissed. [166-168]

The Commonwealth did not make a de facto taking of the property of certain municipal light companies that had invested in the Seabrook Nuclear Power Plant Unit 1 by the official actions and decisions of certain public officials that delayed construction of the project, where any economic consequences to the utility companies by reason of the Commonwealth's concerns for public safety were collateral; furthermore,

---

[1]Eight other municipal light companies and the towns and cities in which those municipal light companies are located, viz., Ashburnham, Boylston, Hudson, Paxton, Peabody, Shrewsbury, Templeton, Wakefield, and West Boylston.

[2]The director of the Massachusetts Civil Defense Agency, the Governor, and the Attorney General. The plaintiffs also named various other municipal light companies, the Vermont Electric Cooperative, and the Massachusetts Municipal Wholesale Electric Company as necessary parties. None of this latter category of parties made claims or, so far as appears from the docket, filed an appearance; none is involved in this appeal.

where the utilities had the status merely of stockholders in the Sea-
brook project they lacked standing to claim damages for the diminution
in the value of the corporation; thus the utilities' claims were correctly
dismissed. [168-171]
There was no merit to the claim of certain municipal light companies that
the Commonwealth, by unspecified action, impaired contractual rights
the utilities possessed by virtue of their investment in the Seabrook Nu-
clear Power Plant Unit 1, and the claim was correctly dismissed. [171]

CIVIL ACTION commenced in the Superior Court Depart-
ment on December 9, 1988.

The case was heard by *Patrick J. King*, J., on a motion to
dismiss.

*Thomas J. Heiden* of Michigan (*Meg Hackett Carrier* of
Michigan, *& Jonathan W. Blodgett* with him) for the
plaintiffs.

*Peter Sacks*, Assistant Attorney General, for the Com-
monwealth & others.

KASS, J. In their brief, the plaintiffs, who are municipal
light companies or departments, state a prodigious twenty-six
issues on appeal but these rather quickly boil down to three.
All are based on actions taken by the Commonwealth to de-
lay the operation of Seabrook Nuclear Power Plant Unit 1
("Seabrook") in Seabrook, New Hampshire. Seabrook, since
the plan for its construction surfaced in 1968, has generated
seemingly countless reactions of super-heated litigation and
civil disobedience. As a consequence of the Commonwealth's
delaying actions, the plaintiffs (which we shall sometimes re-
fer to as the light companies) claim financial losses attributa-
ble to Seabrook having come on line several years later than
would have been the case, but for the Commonwealth's
machinations. The three issues to which the many urged can
be reduced are: (1) whether the Commonwealth[3] is liable for
damages to the light companies on theories of estoppel or im-
plied contract; (2) whether the Commonwealth made a de
facto taking of property without just compensation; and (3)

---

[3]As the various individual defendants acted in their official capacities,
we shall, as a convenience, refer to all the defendants collectively as the
Commonwealth.

whether the Commonwealth unconstitutionally impaired con-
tractual obligations of which the light companies had the
benefit.

A judge of the Superior Court, acting on a motion to dis-
miss under Mass.R.Civ.P. 12(b), 365 Mass. 755 (1974), dis-
missed the complaint for failure to state a claim for which
relief can be granted. We affirm.

We summarize facts alleged in the complaint which, for
purposes of reviewing dismissal of a complaint under
Mass.R.Civ.P. 12(b)(6), we accept as true. *Nader* v. *Citron*,
372 Mass. 96, 98 (1977). We do not purport to make any
determination whether the facts alleged and which we recite
are accurate.

During the early to mid-1970's, in response to a felt need
for capacity to generate more electric power, the Legislature,
by the enactment of St. 1973, c. 571,[4] created the New Eng-
land Power Pool and, by St. 1975, c. 775, created the Massa-
chusetts  Municipal  Wholesale  Electric  Company
("MMWEC").[5] Those statutes enabled, and thereby en-
couraged, electric utility companies in Massachusetts to par-
ticipate in jointly owned power plants in or out of the Comm-
monwealth. In 1975, Seabrook was the only jointly owned
power plant planned in New England available to outside
participants, and the immediate purpose of the MMWEC
legislation was to facilitate and encourage participation in
Seabrook.

Also in 1975, the Department of Public Utilities (DPU)
determined that the Seabrook plant was necessary to meet
the future power needs of the Commonwealth. The following
year, 1976, the Energy Facilities Siting Council approved
MMWEC's participation in the Seabrook project. From mid-
1976 to late 1979, the DPU approved four bond issues (pre-
sumably the issuer of the bonds was MMWEC — the com-

---

[4] Codified at G. L. c. 164A.

[5] MMWEC acts as a wholesaler of electricity which it purchases from
large generating facilities and sells to participating municipal light compa-
nies. Its structure and how it operates are described in *Massachusetts
Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39, 40-42 (1991), also a
case arising out of the Seabrook project.

plaint does not say) which enabled MMWEC to acquire its interest (11.59340%) in Seabrook. Relying on those authorizations and approvals, the light companies acquired a substantial interest in Seabrook through the medium of membership in MMWEC, memberships which involved entry by the light companies into power sales agreements ("PSAs") with MMWEC. Under the PSAs, the light companies were obligated to buy a stated percentage of the generating capacity of Seabrook.[6] The PSAs contain what the parties call a "take or pay" provision, whereby the light companies pay their pro rata share of MMWEC's costs applicable to the shared facility, irrespective of whether the light companies buy electricity and, indeed, irrespective of whether the facility has electricity to sell.[7]

Contrary to its encouragement of Seabrook through the various authorizations and approvals (so the complaint continues), the Commonwealth, acting through its director of civil defense, its Governor, and its Attorney General, impeded the licensure of Seabrook by the United States Nuclear Regulatory Commission (NRC). The Massachusetts authorities delayed licensure by persistently raising questions about the safety of Seabrook, notably the means to evacuate population from the environs of Seabrook in the event of a radiological emergency. Apart from objecting that inadequate safety precautions were being taken, the Commonwealth declined to formulate an emergency response plan. On March 27, 1986, the Governor stated publicly that he would oppose final licensure of Seabrook unless fallout shelters were provided on nearby beaches.

On October 8, 1986, the Seabrook plant was complete and stood ready for commercial operation. All conditions for operation had been satisfied except for the Massachusetts portion of the radiological emergency response plan. Successive

---

[6]The PSA mechanism does not apply to Hudson, which did not join MMWEC but bought a direct interest in the Seabrook project.

[7]How the PSAs function is described in *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. at 42.

Attorneys General[8] continued to oppose the grant of an operating license by the NRC. On February 3, 1988, the Attorney General wrote a letter to the light companies which restated his and the Governor's view that the Seabrook plant should and would not operate and urged the light companies to withdraw from the project, even if that were a default of their obligations under the PSAs. Approximately two years later, on March 15, 1990, the NRC issued a full power operating license to Seabrook.

As a consequence of the delays engineered by the Commonwealth through its officers, the plaintiffs suffered damage because they had to pay their share of the carrying costs (e.g., bond interest) and suffered further damage on account of the electric power they did not obtain from Seabrook and had to buy elsewhere.

It is familiar doctrine that a complaint can be dismissed for failure to state a claim for which relief can be granted only if a reading of the complaint establishes beyond doubt that the facts alleged, accepting them as true and drawing all inferences in the plaintiff's favor, do not add up to a cause of action which the law recognizes. The plaintiff has to plead itself out of court. *Nader* v. *Citron*, 372 Mass. at 98. *Connerty* v. *Metropolitan Dist. Commn.*, 398 Mass. 140, 143 (1986). *New England Insulation Co.* v. *General Dynamics Co.*, 26 Mass. App. Ct. 28, 29-30 (1988). A complaint should not be dismissed because it asserts a novel or extreme theory of liability or improbable facts. *Coolidge Bank & Trust Co.* v. *First Ipswich Co.*, 9 Mass. App. Ct. 369, 370 (1980). *Jenkins* v. *Jenkins*, 15 Mass. App. Ct. 934 (1983).

1. *Liability based on implied contract and estoppel.* Through establishment of the New England Power Pool and MMWEC, approval of the Seabrook site by the Energy Facilities Siting Council, and approval (through the DPU) of MMWEC's bonding authority, the plaintiffs say that the Commonwealth encouraged their investment in Seabrook. On that encouragement the plaintiffs claim to have reasona-

---

[8]Mr. Francis X. Bellotti and later Mr. James M. Shannon.

bly relied and spent a great deal of money.[9] They say that the Commonwealth is estopped to deny an implied contractual obligation to support the Seabrook project and to refrain from acting so as to impede it.

We turn first to the question of estoppel. Generally, the principles of estoppel are not applicable against the government in connection with its exercise of public duties, particularly when the government is acting in the public interest and safety, as its duly constituted officials see that interest. *Phipps Prod. Corp.* v. *Massachusetts Bay Transp. Authy.*, 387 Mass. 687, 693 (1982), and cases cited. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Util.*, 395 Mass. 836, 857 (1985) (also a case arising out of the Seabrook project). *Risk Mgmt. Foundation of Harvard Med. Insts.*, 407 Mass. 498, 509-510 (1990). *Gamache* v. *Mayor of N. Adams*, 17 Mass. App. Ct. 291, 294 (1983).

Here, the Commonwealth, acting through two of its highest officials, the Governor and the Attorney General, and through the director of its civil defense agency, consistently opposed licensure of Seabrook on the public policy ground that operation of the plant posed a significant health and safety risk to the public. Governmental officials need to be free to act in accordance with their constitutional and statutory authority in such manner as they think is in the public interest without encumbrance from earlier collateral decisions which may have suggested a different tendency so far as the public issue is concerned. See, as an illustration, *Hood Indus., Inc.* v. *City Council of Leominster*, 23 Mass. App. Ct. 646, 646 n.1 (1987), in which the mayor and the regional chamber of commerce encouraged the plaintiff to buy land for a manufacturing plant but the city council could lawfully deny a permit to store inflammable liquids. To the degree that it has not become the subject of an express and authorized contract, a public policy is necessarily subject to

---

[9]The complaint alleges that the plaintiffs and MMWEC "directly and indirectly devoted $1 [b]illion to Seabrook." If MMWEC's share is 11.59340% and Hudson has a .07% share, the indirect investment of the plaintiffs would be in the neighborhood of $116,600,000.

changes of view and changes of administration. See *Phipps Prod. Co.* v. *Massachusetts Bay Transp. Authy.*, 387 Mass. at 689, 693-694.

The light companies do not buttress their case by alleging that the Governor and Attorney General were acting to advance their personal political agendas. Opposing Seabrook was within the scope of the general duty of those officials to protect the public interest; it is their actions that matter, not their states of mind.

Related to the theory of estoppel is the implied contract claim. The administrative actions on which the plaintiffs rely, i.e., the siting approval and bonding authority, cannot reasonably be interpreted as an unconditional approval of the Seabrook project. Bonding authority involved a fiscal inquiry. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Util.*, 394 Mass. 671, 680-681 (1985). Safety details had yet to be confronted. Nothing in the statutes creating the New England Power Pool (St. 1973, c. 571) or MMWEC (St. 1975, c. 775) binds the Commonwealth to a particular power facility. Those statutes are purely enabling and mention no particular power facility. As to the Commonwealth's attitude toward Seabrook, it was never one of unalloyed support. There were cross-currents of opposition to the project by Massachusetts as early as 1975, as the complaint states. Upon examination, the statutes and administrative decisions do not provide a reasonable basis for a conclusion that the Commonwealth was unconditionally committed to Seabrook.

2. *De facto taking by the Commonwealth.* The light companies complain that the Commonwealth, by its opposition to Seabrook, so damaged the economic interests of the light companies that it in effect made a taking by eminent domain of their property. Of course there was no taking in the formal sense of G. L. c. 79, § 1. If there is a taking claim it must rest upon G. L. c. 79, § 10 (damage to property without a formal taking), or constitutional requirements of just compensation under the Fifth Amendment to the Constitution of the United States or art. 10 of the Declaration of Rights of the Massachusetts Constitution.

The trial judge disposed of the taking claim on the ground that public entities such as Hudson and the light companies may not make claims for damages based on constitutional rights against the State or another State agency. See *Spence v. Boston Edison Co.*, 390 Mass. 604, 610 (1983); *Trustees of Worcester State Hosp. v. The Governor*, 395 Mass. 377, 380 (1985). There have been occasions, however, when superior public authorities have appropriated to public use property owned by a body politic and corporate which was engaged in a proprietary function, such as a municipal light company, and in those instances eminent domain damages were held payable. *Proprietors of Mt. Hope Cemetery v. Boston*, 158 Mass. 509, 511-512 (1893). *Higginson v. Treasurer & Sch. House Commrs. of Boston*, 212 Mass. 583, 585-589 (1912). *Cambridge v. Commissioner of Pub. Welfare*, 357 Mass. 183, 185-187 (1970). 1 & 2 Nichols, Eminent Domain §§ 2.225[1], 5.550[6] (1993).

In its application to tort liability, the "governmental function" and "proprietary function" distinction has been the subject of censorious comment. See *Morash & Sons v. Commonwealth*, 363 Mass. 612, 622 (1973); *Whitney v. Worcester*, 373 Mass. 208, 213-215 (1977); *Green v. Commonwealth*, 13 Mass. App. Ct. 524, 525-526 (1982). Thus far there do not appear to have been occasions to examine the vitality of the distinction in the context of takings by superior governmental agencies, and an occasion so to do is not present in the instant case because there has been no taking.

Although takings generally involve the appropriation or damage of physical property by a State agency, i.e., acquiring title to or occupying the property, compensable takings may occur when the governmental action deprives an owner of virtually all of that owner's interest in the property affected. *Cayon v. Chicopee*, 360 Mass. 606, 609 (1971). By way of illustration, an owner of business premises was held to have a right to taking damages when an order of taking deprived the business of access to a public way which previously provided the only access. *Cann v. Commonwealth*, 353 Mass. 71, 73-75 (1967). Less convenient access, however, is

not a ground for compensation. *Tassinari* v. *Massachusetts Turnpike Authy.*, 347 Mass. 222, 223-224 (1964). *LaCroix* v. *Commonwealth*, 348 Mass. 652, 657 (1965). What the plaintiffs in the instant case complain of falls in the latter category.

There are economic consequences to the plaintiffs by reason of the Commonwealth's safety demands upon Seabrook but they are collateral consequences. There are collateral consequences from all manner of governmental decisions, e.g., to levy a tax; to impose a tariff; to impose standards of manufacture; to build a new and better road; to locate a new airport; to revoke a subsidy; or to reduce the budget for public safety. There would be no end to assaults on the public purse if persons who suffered economically by reason of public policy or changes in public policy could claim a de facto taking of their property. To this we add the observations (1) that the Commonwealth has not and, of course, could not acquire, hem in, shut down or even inhibit the Seabrook facility, which is located in New Hampshire, and (2) that the interest of the plaintiffs in Seabrook retains value because the generating plant is operating. Obtaining that value has perhaps taken longer and cost more because of the Commonwealth's activity, but that is analogous to inconvenience.

What we have said applies to the theory argued by the plaintiffs that they have suffered a regulatory taking. See *Lucas* v. *South Carolina Coastal Council*, 112 S.Ct. 2886 (1992); *Wilson* v. *Commonwealth*, 413 Mass. 352 (1992). The plaintiffs have not been totally deprived of the value of their property, *id.* at 355, and the Commonwealth has not regulated and cannot regulate Seabrook. Its activities have been confined to the role of an advocate before those Federal agencies which can and do regulate Seabrook.

A further disability which the plaintiffs suffer as taking claimants is that they are not the applicant for the operating license for Seabrook. As stockholders have an interest in a corporation, the plaintiffs have an interest in Seabrook. Stockholders may not in their own names bring an action for damage to the corporation in which they hold stock; they

may bring a derivative action in the name of the corporation. *Schaeffer* v. *Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 513 (1989). *Vincel* v. *White Motor Corp.*, 521 F.2d 1113, 1118 (2d Cir. 1975). *Citizens for an Orderly Energy Policy, Inc.* v. *County of Suffolk*, 604 F. Supp. 1084, 1091 (E.D.N.Y. 1985) (utility ratepayers and shareholders lacked standing to claim unlawful interference with utility's application for an operating license from the Nuclear Regulatory Commission).

3. *Impairment of contract claim.*The last clutch of claims asserted by the plaintiffs is that the action of the Commonwealth impaired the contractual rights which they had in relation to Seabrook and, thus, the Commonwealth acted contrary to Art. I, § 10, cl. 1, of the United States Constitution, commanding that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ." That constitutional provision aims "at the legislative power of the State, and not at decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals." *New Orleans Waterworks Co.* v. *Louisiana Sugar Ref. Co.*, 125 U.S. 18, 30 (1888). *Hanford* v. *Davies*, 163 U.S. 273, 278 (1896). See *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 15-16 (1977); *Boetti* v. *Ogden Suffolk Downs, Inc.,* 587 F. Supp. 1048, 1050 (D. Mass. 1984). The plaintiffs do not point to any act of the Legislature which impaired their contract. An additional obstacle for the plaintiffs is the inhibition, previously adverted to, upon the assertion of constitutional claims by a public entity created by the State against the State. See *Spence* v. *Boston Edison Co.*, 390 Mass. at 610.

The complaint was rightly dismissed as failing to state a claim for which relief can be granted. The judgment of dismissal is affirmed.

*So ordered.*