BOSTON EDISON COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. May 9, 1984. — November 8, 1984.

Present: WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Public Utilities,* Fuel charges, Electric company. *Department of Public Utilities,* Decision.

In a proceeding before the Department of Public Utilities brought by an electric company seeking approval for recovery of replacement power costs incurred during a refueling and maintenance outage of a nuclear power plant, there was substantial evidence to support the department's conclusion that the company's imprudent management in the performance of work on certain block walls prolonged the outage by eight days, and there was no prejudicial error in the department's refusal to consider certain evidence offered by the company to show that the delay caused by work on the walls was rendered immaterial as a result of other delays necessitated by requirements of the Nuclear Regulatory Commission. [248-251] WILKINS, J., concurring in the result.

Where, in a proceeding before the Department of Public Utilities by an electric company seeking approval for recovery of certain fuel costs, the department's decision that a portion of such costs were attributable to mismanagement by the company was supported by substantial evidence, the department in a subsequent proceeding properly deducted these costs from the fuel charge proposed by the company for the next following three-month period, despite certain evidence at the second proceeding tending to show that the costs in question would have been incurred even if there had been no mismanagement. [251-252] WILKINS, J., concurring.

On appeal from decisions of the Department of Public Utilities in two proceedings by an electric company seeking approval of fuel charges proposed for two successive three-month periods, it was held that the company had not been prejudiced by the department's restriction of the scope of each proceeding to certain periods. [252-253]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on July 6, 1982, and August 26, 1982, respectively.

The cases were reported by *Wilkins,* J.

*Douglas S. Horan (Wayne R. Frigard* with him) for the plaintiff.

*Thomas A. Barnico,* Assistant Attorney General, for the defendant.

LIACOS, J. We have before us appeals from a series of orders issued by the Department of Public Utilities (department) in response to applications by Boston Edison Company (company) for approval of fuel charges for the billing months of February through July, 1982. G. L. c. 164, § 94G, as appearing in St. 1981, c. 375, § 4.

The company presents two primary arguments. It first challenges, as not supported by substantial evidence, what it characterizes as the department's finding of a causal connection between the delayed return to service of Pilgrim Unit I nuclear power station (Pilgrim I) in April, 1982, following a refueling and maintenance outage, and the company's modification work on two masonry walls in the unit during the outage. The company also contends that the department's subsequent finding that replacement power costs for a portion of the outage were necessitated by that wall work is not supported in the record and is in conflict with evidence in the record. We affirm the orders.

The statutory context of the case is provided by the authority granted the department in G. L. c. 164, § 94G (*a*), to deduct from a fuel charge proposed for the next quarter the amount of those fuel costs determined to be directly attributable to a company's unreasonable or imprudent performance; and, in § 94G (*b*), to deduct that amount determined to be directly attributable to the company's defective operation of the unit.[1] Each determination is to be made in light of the facts which the company knew or should reasonably have known at the time of the actions in question.

The factual background to these proceedings is as follows. In May, 1980, the Nuclear Regulatory Commission (NRC)

---

[1] We have not been asked to resolve the disagreement between the company and the department regarding the applicability of G. L. c. 164, § 94G (*a*).

issued Bulletin 80-11, which required that the company demonstrate that certain walls in Pilgrim I could withstand the effects of forces produced by specified events. The company was instructed to analyze all safety-related walls, using new design criteria, and take corrective action on all walls which were inadequate to withstand the applicable loads. The company is a member of the New England Power Pool, which has established procedures that all members must follow when requesting and purchasing replacement power during an outage. Unscheduled outage power is invariably more costly, according to the department, than scheduled outage power. Nuclear units are entitled to six weeks of scheduled outage power a year. A variance, requesting additional scheduled outage time for non-routine outage tasks, may be requested up to sixty days before the beginning of a scheduled outage.

On August 15, 1980, the company requested a ten-week variance for the outage scheduled to begin on September 26, 1981, and to end on December 5, 1981. It did not submit a request for additional time until January 19, 1982. The outage ended in April, 1982. In January, 1982, the company initiated the proceedings at issue when it filed with the department an application for a fuel and purchased power billing factor for the months of February, March, and April (D.P.U. 1009-F), and in April, when it filed an application for approval of a factor for the period May through July, 1982 (D.P.U. 1009-G).

The department's consideration of D.P.U. 1009-F encompassed both an examination of the company's preparations for and its conduct during the outage through February 28, 1982.[2] The department found that, considering what the company "knew or reasonably should have known about the complexity of the block wall work on July 26, 1981" (the deadline for requesting additional scheduled outage time), the company was unreasonable in not requesting additional time; and that the company's "actions with respect to the untimely identification of . . . walls 111.3 and 111.6 (as ones requiring modifications)

[2] In February, 1982, the department approved a fuel adjustment factor for the period February through April, 1982, subject to refund with interest pending the conclusion of the investigation.

were imprudent." The department also included within its "findings" the statements that the company had ignored a problem regarding the scope of the modification work for approximately a year without justification; and that the "failure to confront this problem in a timely manner directly caused an eight-day delay in all start-up activities." As a result, the department concluded that the costs for the eight-day delay should not be passed through to the company's customers. It then directed that those fuel costs directly attributable to the company's unreasonable actions be deducted, with interest, from the fuel charge for the following quarter.[3]

In D.P.U. 1009-G the department found no fuel costs in the proposed fuel factor to be directly attributable to any unreasonable or imprudent performance by the company during the period May through July, 1982. It then ordered that the company apply the difference between the amount directly attributable to the unreasonable actions ascribed to the period February through April,[4] and the amount used in calculating the fuel charge for May, June, and July, to the calculation for August through October, 1982.

The company, acting under the authority granted in G. L. c. 25, § 5, filed a petition for appeal with the Supreme Judicial Court for Suffolk County from the final decision, order and rulings of the department in D.P.U. 1009-F, 1009-F-1, and 1009-F-2; and a separate petition from the final decision, order, and rulings in D.P.U. 1009-G. A single justice reserved and reported the appeals, consolidated on motion of the company, while stating that the administrative records should not be treated as consolidated by allowance of the motion to consolidate.[5]

---

[3] The amount specified was revised in an amended order. The company later filed a motion for reconsideration and stay. D.P.U. 1009-F-2. The department ordered that the amount specified in the amended order be deleted, that a corrected amount be substituted, and that the amount in the amended order be used as an estimate. In an interim order in D.P.U. 1009-G the department found the company's resulting revised fuel factor to be correct and authorized it to be put into effect.

[4] Subsequently revised in D.P.U. 1009-G-2.

[5] We also note that the company had represented to the single justice that the sole issue it would present to the full court was "whether the Department

The company first argues that the department's finding in D.P.U. 1009-F of a causal connection between its work in February, 1982, on walls 111.3 and 111.6, and the return to service of Pilgrim I in April, 1982, is not supported by substantial evidence.

Initially, we note that the company misdescribes the findings. The department found that the company acted unreasonably about requesting additional time, and imprudently with respect to walls 111.3 and 111.6. It stated that the "failure to confront this problem [apparently referring to determining whether walls 111.3 and 111.6 required modifications] in a timely manner directly caused an eight-day delay in all start-up activities." Thus, the department identified a direct causal connection to the delay in start-up activities, rather than to the unit's return to service in April.[6] The distinction is of significance to the determination whether the finding of a causal connection is supported by substantial evidence.

Peter O'Brien, a construction manager in the company's nuclear engineering department, testified that the delay in completing the outage was caused primarily by labor problems at the site and by the discovery of a significant amount of repair and reconstruction work, not anticipated prior to the outage, including modifications of masonry block walls. Lawrence McDonald, a consulting engineer, also stated that "we" knew on December 30 that work on the walls would extend the outage.

The walls at issue (111.3 and 111.6) were added to the project on January 22, 1982. Their addition was a matter of judgment and followed unsuccessful attempts to make a determination based upon an engineering analysis and evaluation. Work on 111.3 was completed on February 16, and work on 111.6 was completed on February 22.

---

erred in finding in D.P.U. 1009-F, and affirming in D.P.U. 1009-G, that [the company's] work on certain . . . walls in February, [1982], caused an eight day delay in the return to service of the Company's Pilgrim I . . . unit in April, [1982]."

[6] In D.P.U. 1009-F-2 the department stated: "The delay in the completion of the block wall modifications caused a delay in the startup activities. The delay in the startup activities is what extended the outage . . . ."

The relation between the required modification work on the walls and the return of Pilgrim I to service is also reflected in "1981 Refueling Outage Report No. 92," dated February 10, 1982. The report states, in referring to the two walls: "With possible 10 days of structural work to complete these walls, startup now scheduled for 2/18/82 will be delayed until 2/26/82." Report No. 96 referred to the work as being "required for startup." Report No. 100, dated February 22, 1982, recites: "The blockwall work required for plant startup is complete as reported today." These reports clearly indicate the direct relation between completion of the wall work and the initiation of start-up activities. We have no indication that the start-up process, delayed for eight days until February 26 because of the need to complete the wall work, was begun any sooner once the wall work was completed on February 22.[7]

Dale Bridenbaugh, a consultant, testified that, in his opinion, the company could have completed the evaluation process prior to the beginning of the outage; that the company's judgment was not "too good"; and that it was clear to him that the outage extension was attributable to the fact that the block wall work "wasn't done."

Our review to this point reveals that the department's finding that the company's failure, as described earlier, caused an eight-day delay in all start-up activities is supported by substantial evidence.[8] Nevertheless, to meet our obligation to consider

---

[7] The department states that Outage Report No. 103 indicates that start-up began on February 26, 1982.

[8] Since the company's challenge does not constitute a claim of confiscation, the standard of review is that contained in G. L. c. 30A, § 14 (7). *Boston Edison Co.* v. *Department of Pub. Utils.,* 375 Mass. 1, 9 (1978). Although that standard (substantial evidence) is not simply defined, we have frequently stated that it is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 466 (1981), quoting G. L. c. 30A, § 1 (6). We are required to give " 'due weight to the experience, technical competence, and specialized knowledge of the agency,' G. L. c. 30A, § 14." *Costello* v. *Department of Pub. Utils.,* 391 Mass. 527, 539 (1984). The court does not substitute its judgment for the department's when no constitutional question is presented. *Attorney Gen.* v. *Department of Pub. Utils.,* 390 Mass. 208, 228 (1983).

the entire record, we also review that which detracts from the weight of the evidence. See *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 466 (1981).

In so doing, we examine the company's assertion pertaining to the issuance by the NRC of a Confirmatory Action Letter (CAL) on February 18, 1982. The company states that the letter "mandated a fundamental change in the scope of the . . . scheduled 10 day pre-start testing program"; and that, after six days of planning and analysis, the company changed its forecast for start-up from February 28 to March 22, in order to complete the action required by the NRC. Start-up was commenced on March 24. The company contends that, even if the work on the walls had been completed earlier, the work mandated in the CAL could not have been completed more quickly. It argues that the work on the walls, therefore, did not ultimately cause the delay in start-up.

The company offered testimony (and exhibits) of Charles Mathis, deputy plant manager of Pilgrim Station, given prior to the commencement of the hearing in 1009-F. According to that testimony, the pre-start-up period forecast on January 4th (of February 18-28) would be longer and result in a delay of start-up by about three weeks (until March 22, 1982) because of the requirements contained in the NRC's CAL.[9]

The Attorney General moved to strike the testimony and exhibits, asserting that the Mathis testimony was not a proper subject for the proceedings. The department concluded that the testimony related only to circumstances which resulted in an extension of the outage beyond the February 28 proposed on-line date and that, as such, it was not a proper subject of the investigation, which was to examine the propriety of costs incurred in December, January, and February. The department granted the motion to strike.

---

[9] The issue the company sought to raise is whether the additional work extended the delay attributable to the wall modifications or whether it totally replaced it by encompassing the period from the time the letter was received until the time the CAL tasks were completed.

The department did not commit prejudicial error in excluding the evidence.[10] The department, as fact finder, made it clear in its order on the Attorney General's motion that it interpreted the testimony as being applicable to only the post-February period and, as a result, beyond the scope of the proceedings in D.P.U. 1009-F. We will not disturb that determination. See generally *Labor Relations Comm'n* v. *University Hosp., Inc.,* 359 Mass. 516, 521 (1971), citing *Universal Camera Corp.* v. *NLRB,* 340 U.S. 474, 488 (1951). It would, moreover, be futile to remand for admission and consideration of the Mathis material because the department has indicated, in effect, that it would not give the material any weight concerning the February period.

Also, the Mathis material does not detract from that quantum of evidence supporting the department's findings in D.P.U. 1009-F. Nor does it establish that the CAL-mandated work supplanted rather than supplemented the work regarding the two walls, as having directly caused an eight-day delay in all start-up activities. We conclude, after reviewing the entire record in D.P.U. 1009-F, that the department's finding of a causal connection is supported by substantial evidence.[11]

We consider the company's argument that the department's "finding that $3,323,645 in replacement power costs were caused by the eight days of masonry wall work in February, 1982," is not supported in the record and is in conflict with the evidence in the record.[12]

The company asserts that the findings in D.P.U. 1009-F lack "any evidentiary basis" and that those findings may not be used to support the decision in D.P.U. 1009-G. We have

---

[10] The better practice in this instance might have been to admit the testimony and then to determine the weight to be given to it.

[11] The company acknowledges that "if the critical path had remained as the Company had forecast, then the outage would indeed have been delayed as a result of this work on the block walls." It then points out that the critical path did not remain as forecast — that it was changed by the issuance of the CAL.

[12] The amounts set in D.P.U. 1009-G ($3,533,762 for the eight days; and $5,343,363 for the total due to imprudence found in D.P.U. 1009-F-2) were amended in D.P.U. 1009-G-2.

concluded that the findings in D.P.U. 1009-F are supported by substantial evidence. Their use in the subsequent hearing is required by statute. Imprudently incurred fuel costs shall be deducted from the fuel charge proposed for the next following quarter. G. L. c. 164, § 94G (*a*). The amount of such costs directly attributable to defective operation of a unit are to be deducted from the fuel charge proposed for the next quarter. G. L. c. 164, § 94G (*b*).

The company also contends that the testimony of its senior vice president, William Harrington, undermines support for the department's finding because he stated that the work on the walls did not delay compliance with the CAL; that, even if the work on the walls had been completed earlier, the company could not have responded to the CAL more quickly; and that the total outage length was not increased as a result of the work on the two walls. The Attorney General sought unsuccessfully to strike portions of Harrington's testimony as being beyond the scope of the hearing. Although the colloquy among counsel and the hearing officer does not contain a ruling which is without qualification as to the basis of the testimony's admission, the hearing officer did state that "[i]t is not in any way going to be used to change the Department's determination in the previous hearing." She stated that it "will be used for the purposes of this hearing." The hearing was considering the company's application for approval of fuel charges for the billing months of May, June, and July, 1982. It did not encompass February. Hence, the department's findings in D.P.U. 1009-F are undiminished by, and not in conflict with, the Harrington testimony, given in the context of D.P.U. 1009-G, a distinct proceeding. The department was required to apply the costs attributable to its findings in D.P.U. 1009-F to its determination of the fuel charge allowed in D.P.U. 1009-G. G. L. c. 164, § 94G (*a*) and (*b*).

We last consider the company's assertions that it was prejudiced because the department reached its decision in D.P.U. 1009-F in reliance on the "procedural fiction that the outage . . . ended on February 28, 1982," and ignored the facts that the outage had been extended by other causes and that changes

related to the CAL could alter the findings. The company was not prejudiced by the department's restricting the scope of each proceeding to that period for which each fuel allowance application was made. The company had the opportunity to present evidence as to each period in issue at the pertinent hearing. The nature and scope of the evidence was not controlled by a "procedural fiction." The company could have presented evidence in D.P.U. 1009-F that work required by the CAL in the period at issue had supplanted the wall work as determinative of the length of the outage. The company does not argue that it objected at the time to the scope of the 1009-F proceedings or that it sought to reopen them for this purpose.[13] Furthermore, the department, in D.P.U. 1009-F-2, agreed that the replacement fuel costs should be calculated on the basis of the final days of the outage and not on the last days of February. This revision reveals a recognition by the department that the outage extended beyond February; yet it retains the basic premise that there was a causal connection between the wall work and the delay in start-up activities. The department did not rely on a "procedural fiction."

We conclude that the department's finding in D.P.U. 1009-F, that the company's failure to take appropriate and timely action regarding the modification of two masonry walls directly caused an eight-day delay in start-up activities, is supported by substantial evidence. The department's use in D.P.U. 1009-G of its findings in D.P.U. 1009-F is required by statute. In addition, the finding that replacement power costs were incurred because of the wall work does not conflict with the evidence.

A judgment is to enter affirming the department's orders in D.P.U. 1009-F, 1009-F-1, 1009-F-2, and in 1009-G and 1009-G-2.

*So ordered.*

---

[13] In its request for reconsideration, the company did not focus on trying to put into the record in 1009-F evidence which would tend to show that the delay, if any, attributable to the wall work was superseded by that attributable to the CAL or to any other cause. Instead, it again discussed the exclusion of evidence pertaining to events after February 28, 1982. Admission of such evidence would not necessarily undermine the department's finding regarding delay incurred during February.

WILKINS, J. (concurring). The record shows that the company's unreasonable delay in completing work on masonry block walls set back the return to service of Pilgrim I by eight days unless that delay became unimportant because of the independent effect of action required by the Confirmatory Action Letter (CAL) issued by the Nuclear Regulatory Commission on February 18, 1982. The company is correct in saying that there is no substantial evidence in the record in D.P.U. 1009-F that would support a finding that the delayed work on the masonry block walls was the cause of eight days of outage of Pilgrim I. The court's reliance on events occurring prior to the CAL ignores the basic question — the effect, if any, of the CAL on the delay.

The DPU's position that it would not look beyond the end of February to see what caused the delay was wrong as a matter of law. The DPU should not have struck Mathis's testimony. It related to questions of causation.

Where under G. L. c. 164, § 94G, it is shown that a company was unreasonable or imprudent in its performance and that thereby fuel costs appear to have been made higher unnecessarily, but the company claims that some supervening event "saves" it (by making the company's mistake not a cause of any higher fuel costs), the company has the burden of coming forward with evidence that the supervening event and not its error was the cause of the delay. Here the company sought to present testimony from Mathis relating to the effect of the CAL and, as I have said, the department improperly struck it from the record. That error was not prejudicial, however, because Mathis's proposed testimony failed in one crucial respect. We know that compliance with the CAL delayed the return of Pilgrim I to service, but there is no evidence on the record in D.P.U. 1009-F as to whether the masonry block wall delay was sequential to or subsumed within the CAL delay.

I concur in the result in D.P.U. 1009-F for the sole reason that there is no evidence in the record to show that the CAL-based work supplanted the masonry block wall work as a cause for the delay. Evidence presented in D.P.U. 1009-G on this

point came too late, because the department was entitled (although not required) to rely on its conclusion in D.P.U. 1009-F concerning the cause of eight days' delay. I thus join in the affirmance in D.P.U. 1009-G.