FITCHBURG GAS AND ELECTRIC LIGHT COMPANY *vs.*
DEPARTMENT OF PUBLIC UTILITIES & others
(and three companion cases[1]).

Suffolk.   May 9, 1985. — September 12, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Department of Public Utilities. Public Utilities,* Judicial review, Financing.
*Electric Company. Administrative Law,* Notice, Hearing, Substantial
evidence. *Due Process of Law,* Public utilities. *Constitutional Law,*
Impairment of contracts, Equal protection of laws, Confiscation of prop-
erty. *Estoppel.*

The authority of the Department of Public Utilities under St. 1975, c. 775,
    § 17, to determine whether a proposed issuance of securities by the
    Massachusetts Municipal Wholesale Electric Company is reasonably
    necessary is of the same scope as the department's authority in making
    such a determination under G. L. c. 164, § 14. [841-843]
In proceedings before the Department of Public Utilities, brought by a
    number of electric companies seeking approval of proposed bond issues
    related to the construction of the Seabrook Nuclear Project, the depart-
    ment did not exceed its authority in concluding that, as a result of the
    failure by the companies to present a reasonable range of possible cost
    estimates for the project supported by reviewable and realistic construc-
    tion schedules, it was unable to make a determination whether the project
    was reasonably necessary, in refusing to approve the bond issue proposed
    by the Massachusetts Municipal Wholesale Electric Company, and in
    refusing to approve the bond issues proposed by the investor-owned
    companies unless these companies agreed to certain conditions to assure
    that the risks of the project were fully disclosed to investors and were
    not to be borne by the ratepayers. [843-844]
In proceedings before the Department of Public Utilities, brought by a
    number of electric companies each separately seeking approval of a
    proposed bond issue related to the construction of the Seabrook Nuclear
    Project, in which the companies jointly requested that the Department
    conduct an investigation of the cost and schedule for the completion of

    [1] The New England Power Company, Canal Electric Company, and the
Massachusetts Municipal Wholesale Electric Company also filed appeals
from the order of the Department of Public Utilities.

the project in a single general proceeding, there was no merit to the contention made by the companies that, as a result of the dispositive effect of the department's decision in the general proceeding, which made it unnecessary for the department to consider many of the questions presented in the individual cases, the companies were denied "sufficient notice of the issues involved to afford them a reasonable opportunity to prepare and present evidence and argument," in violation of G. L. c. 30A, § 11. [844-847]

In proceedings before the Department of Public Utilities, brought by electric companies seeking approval of proposed bond issues related to the construction of the Seabrook Nuclear Project, there was substantial evidence to support the department's conclusions that the testimony of an expert witness for the companies respecting the expected costs and completion date for the project was unrealistic, especially when viewed in the context of the extremely disappointing past history of the project, and that, consequently, the companies had failed to meet their burden of providing a credible analysis of the potential costs of the project. [847-851]

Electric companies seeking approval from the Department of Public Utilities of proposed bond issues related to the Seabrook Nuclear Project were not denied due process of law by the manner in which the department conducted the proceedings. [851-852]

An order of the Department of Public Utilities denying requests by electric companies for approval of proposed bond issues related to the Seabrook Nuclear Project did not amount to an unconstitutional impairment of the obligation of contracts. [852-854]

In proceedings before the Department of Public Utilities, brought by three investor-owned electric companies and the Massachusetts Municipal Wholesale Electric Company, a public corporation existing under St. 1975, c. 775, seeking approval of proposed bond issues relating to the Seabrook Nuclear Project, the department's decision, stating that it would permit the public corporation to issue only such bonds as would be "reasonably necessary to mitigate the adverse consequences of . . . rate shock associated with [the corporation's] investment [in the project] to date," while denying all financing for the investor-owned companies, did not violate the companies' rights to equal protection of the laws. [854-855]

In the circumstances, an order of the Department of Public Utilities denying a request by an electric company for approval of a proposed bond issue related to the Seabrook Nuclear Project was not confiscatory. [855-856]

On appeal from an order by the Department of Public Utilities denying requests by electric companies for approval of proposed bond issues related to the Seabrook Nuclear Project, there was no merit to the companies' contention that because they acted in reliance on prior decisions of the department, or prior department approval, in entering into contracts respecting the Seabrook project, estoppel principles required the department to approve the proposed bond issues. [856-858]

Where requests by electric companies for Department of Public Utilities approval of proposed bond issues related to the Seabrook Nuclear Project also included requests for approval of long-term securities to finance construction unrelated to the Seabrook project, and where the department denied approval on the ground that it had not been shown that the Seabrook project was reasonably necessary, the cases were remanded to the department for resolution of the questions regarding the reasonable necessity of the projects unrelated to Seabrook and the companies' ability to segregate the proceeds of the security issues. [858-859]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on April 12, 1985.

The cases were reported by *O'Connor, J.*

*Nicholas J. Scobbo, Jr.,* for Massachusetts Municipal Wholesale Electric Company.

*Paul K. Connolly, Jr.,* for Fitchburg Gas & Electric Light Co.

*Michael F. Donlan (James M. Avery & Eric J. Krathwohl* with him) for Canal Electric Company.

*Thomas G. Robinson (Frederic E. Greenman & John F. Sherman, III,* with him) for New England Power Company.

*Thomas A. Barnico,* Assistant Attorney General, for Department of Public Utilities.

*Jeffrey M. Bernstein (Charles Harak* with him) for Coalition for Municipal Ratepayers' Rights, intervener.

*Douglas I. Foy* for The Conservation Law Foundation of New England, Inc., intervener.

*David A. Tibbetts,* for Executive Office of Energy Resources, intervener, submitted a brief.

*David B. Broughel, C. Duane Blinn, Allan B. Taylor & Robert J. Yamin,* for New England Power Pool Executive Committee, amicus curiae, submitted a brief.

HENNESSEY, C.J. We review, on reservation and report by a single justice of this court, consolidated appeals by Fitchburg Gas and Electric Light Company (Fitchburg), New England Power Company (New England), Canal Electric Company (Canal), and Massachusetts Municipal Wholesale Electric Company (MMWEC) from an order by the Department of Pub-

lic Utilities (department).[2] In that April 4, 1985, order (D.P.U. 84-152) the department announced it would deny the financing application of each investor-owned utility (Fitchburg, New England, and Canal) unless it received "adequate enforceable assurances and binding obligations" committing each investor-owned utility to three conditions (reproduced in the margin[3]). Each investor-owned utility declined to provide the assurances, and appeals from the effective denial of its individual application for financing. The department, unconditionally and without reference to any "assurances," also denied MMWEC's financing request[4] and stated that it would "permit MMWEC to issue only such bonds as . . . [it finds] are reasonably necessary to mitigate the adverse consequences of . . . rate shock associated with its investment to date," but would not permit it "to issue bonds to pay for further construction costs" of the Seabrook Nuclear Project Unit I (Seabrook I). We affirm the department's decision and orders in so far as they concern the Seabrook I financing applications. We remand to the depart-

---

[2] We acknowledge the assistance of interveners' briefs from the Coalition for Municipal Ratepayers' Rights, The Conservation Law Foundation of New England, Inc., the Executive Office of Energy Resources, and the amicus curiae brief filed by the New England Power Pool Executive Committee.

[3] "1. In the event Seabrook I does not become commercially operable, cost recovery from ratepayers will be limited solely to those expenditures which were prudently incurred before the date of this Order. 2. In the event that Seabrook I becomes commercially operable, cost recovery from ratepayers will be limited to the marginal costs of capacity and energy that would otherwise be faced by the utility, but in no event more than the amount which would be collected by placing the prudently incurred, used and useful portion of the cost of the plant in rate base and no less than the amount that the company would be entitled to collect if the plant were abandoned as of the date of this Order. 3. In the alternative, a company may choose to receive an as-available marginal cost rate for electricity produced throughout the life of Seabrook I, without a constraint on the minimum and maximum levels of cost recovery."

The department stated: "By requiring these assurances it is our intent . . . to ensure that any right . . . to seek to collect prior prudent expenditures on Seabrook I is preserved."

[4] It indicated it would issue an order to that effect in the pending MMWEC financing proceeding, D.P.U. 1627-Phase II/84-162. MMWEC appeals therefrom.

ment for further consideration the applications of the investor-owned utilities for approval of non-Seabrook financing.

The three investor-owned utilities are private corporations which supply electric power. MMWEC is a public corporation formed under c. 775 of the Acts of 1975 to develop a bulk power supply program for Massachusetts municipal electric systems, with authority to acquire, construct, and finance ownership interests in electric generating units to serve the municipalities who are members. Neither the investor-owned utilities nor MMWEC must get permission of the department to invest in power sources, but all must get approval of the department for bond or stock issue. G. L. c. 164, § 14 (1984 ed.) (investor-owned utilities). St. 1975, c. 775, § 17 (MMWEC). Each petitioner had at least one financing case pending before the department when, on July 13, 1984, they filed a joint petition requesting that the department conduct a single investigation of the cost and schedule for the completion of Seabrook I. The petitioners sought findings of fact on those issues and requested that the findings be incorporated into the pending individual applications by which each sought authorization and approval of stock and bond issuances related, at least in part, to Seabrook I construction costs.[5] In response, the department decided that it would investigate: "(1) the estimated cost of completing Seabrook I, including construction and financing costs; (2) the estimated completion date and commercial on-line date of Seabrook I; and (3) the estimated operating characteristics of Seabrook I."

The department's findings in this, the "generic case," include: that "serious questions remain" as to whether Seabrook I will be completed; "that the [petitioners'] failure to present a reasonable range of possible cost estimates supported by reviewable and more realistic construction schedules" was

---

[5] The applications of the investor-owned utilities were filed pursuant to G. L. c. 164, § 14, and MMWEC's under St. 1975, c. 775, § 17. Fitchburg owns 0.86519 per cent of Seabrook I; New England 9.95766 per cent; Canal 3.52317 per cent; and MMWEC owns 11.5934 per cent on behalf of twenty-eight municipal light departments in Massachusetts and eight public power participants in Rhode Island, Vermont, and Maine.

fatal; and that they had "failed to meet their burden of providing . . . a credible analysis of the potential costs of the project." It also found that the issuances proposed in the individual financing cases could not be determined to be reasonably necessary based on an economic analysis of the project; that in the absence of assurances that the public interest would be protected it found that the requests could not be approved "consistent with the requirements of G. L. c. 164, § 14," and St. 1975, c. 775; and that "the degree of risk associated with increased costs and potential future abandonment . . . precludes a finding that the plant is reasonably necessary." However, the department also found that the statutory standard would permit approval of the financing applications of the three investor-owned companies without such an economic analysis if it were assured that the risks were fully disclosed to investors and were not being borne by the ratepayers. Hence, it announced the requirements set out in the margin (note 3). The department considered itself to be unable to similarly insulate MMWEC's ratepayers from the high level of risk associated with the project,[6] could not find its proposed bond issue to be reasonably necessary, and unconditionally denied MMWEC's financing application.

The investor-owned utilities and MMWEC argue that the department inappropriately exercised its statutory authority in denying the requests, deprived them of particular protections of G. L. c. 30A (1984 ed.), and violated certain constitutional rights. We now consider these challenges.[7]

I. DEPARTMENT'S AUTHORITY.

We first examine the nature and scope of the department's authority. Gas and electric companies are permitted to issue "only such . . . stock and bonds . . . as the department may . . . vote is reasonably necessary for the purpose for which such

---

[6] Rates paid by municipal light department customers, through participation in an MMWEC project, are not subject to departmental review and MMWEC does not have stockholders, other than ratepayers, to evaluate and help bear risks.

[7] The petitioners have filed with the full court various affidavits as to factual matters not presented to the department. Even if we were to consider all of this additional material, it would not change our decision or reasoning.

issue . . . has been authorized." G. L. c. 164, § 14. In *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.,* 394 Mass. 671, 678 (1985) (*Fitchburg I*), we reiterated our determination that the statute's purposes include the vesting "in public officers [of] the right to determine the general question of the reasonable necessity of the issue"; and repeated our statement that "the department must inquire whether the declared purpose of the proposed issue is . . . in the circumstances a reasonably necessary purpose. . . . '[R]easonably necessary' means reasonably necessary for the accomplishment of some purpose having to do with the obligations of the company to the public and its ability to carry out those obligations with the greatest possible efficiency. . . ." *Id.,* quoting *Lowell Gas Light Co.* v. *Department of Pub. Utils.,* 319 Mass. 46, 52 (1946). Thus, the department's authority is not limited to "a perfunctory review" of the proposed financing.[8] *Id.*

The department's authority regarding MMWEC is expressed in substantially similar terms: "The corporation shall issue only such amount of bonds as the department may from time to time vote is reasonably necessary for the proposed purpose of such issue . . . ." St. 1975, c. 775, § 17. In addition, the opinions on which we relied in construing G. L. c. 164, § 14, in *Fitchburg I,* were issued long before the Legislature adopted the phrasing of § 17. See *Lowell Gas Light Co.* v. *Department of Pub. Utils.,* 319 Mass. 46, 52 (1946); *Fall River Gas Works* v. *Gas & Elec. Light Comm'rs,* 214 Mass. 529, 538 (1913). Moreover, the language at issue in *Lowell Gas, supra* at 52, and in *Fitchburg I, supra* at 678, is identical, and that construed in the *Fall River* case, *supra* at 532, contains language similar to that in St. 1975, c. 775, § 17. Therefore, we conclude that in selecting the phrasing for § 17 the Legislature was aware of those earlier interpretations and intended that § 17 be similarly construed. There is no indication that the Legislature

---

[8] In their reply brief the investor-owned utilities state that the *Fitchburg I* decision "makes clear that the Department has authority to undertake a 'public interest' inquiry as that term has been construed by the Court. The decision moots the statutory argument on the scope of the Department's inquiry made in the Utilities' initial brief."

intended that a less demanding standard be applied to an application from a public instrumentality than from a private corporation. Hence, we conclude that with respect to the application of MMWEC, as well as on those of the investor-owned utilities, the department's authority was that defined in *Fitchburg I.*

With the *Fitchburg I* decision as background, the investor-owned utilities and MMWEC turn to arguing that the department is obligated to consider whether the risks regarding non-completion and further increased costs are reasonably necessary to meeting their obligation to serve the public interest. They contend that under *Fitchburg I* the department is required to consider all factors, especially those of power need and alternative sources of supply, that bear on the public interest.

In affirming substantial segments of the department's order we do not diminish the significance of our statements defining reasonably necessary. Although in *Fitchburg I* we referred to the obligations which companies have to the public and to their ability to meet them efficiently, we also restated that the burden of proving reasonable necessity is on the companies, noted that the department has a range of discretion, and repeated our statement that the determination whether an issue is reasonably necessary is a question for the department, not for the court. *Id.* at 678, 680. That language is instructive here as more fully discussed later in this opinion. The investor-owned utilities and MMWEC neither met their burden of proof on cost and completion nor persuaded the department to consider other factors no matter what it found regarding cost and completion.[9]

MMWEC, focusing on the statute, argues that the denial of financing authority and the consequences of that denial are inconsistent with the letter and purpose of St. 1975, c. 775, § 17, especially because "'reasonably necessary' means reasonably necessary for the accomplishment of some purpose having to do with the obligation of the Company to the public and its ability to carry out those obligations with the greatest

---

[9] Moreover, although application of the term reasonably necessary might encompass consideration of the existence or absence of alternative financing sources as MMWEC alleges, we consider that to be a guiding factor, not a governing one.

possible efficiency," citing *Lowell Gas Light Co.* v. *Depart-ment of Pub. Utils., supra* at 52. It points to a series of binding obligations which the department approved in the past, reliance based thereon, its need to replenish funds by December 1, 1985, to meet its Joint Ownership Agreement (JOA) obliga-tions, the alleged department practice indicating that reasonably necessary means that other resources are not available to pay for those obligations, the alleged failure by the department to consider the consequences of its action, and the provision that the act is to be liberally construed (St. 1975, c. 775, § 23), — all as requiring a decision authorizing the financing, at least subject to terms and conditions in the public interest.

The department must not only determine whether the amounts sought are reasonably necessary, but must also decide whether the purposes themselves are reasonably necessary. This decision permits, indeed requires, a determination by the department as to the relative risk involved. These issues are for the department, not for the court. We emphasize that we interpret the department's decision as stating that it was *unable to reach a finding* that Seabrook I is reasonably necessary, rather than determining it is not necessary. We conclude, there-fore, that the department neither exceeded its authority nor failed to exercise it appropriately.

II. PROCEDURE: NOTICE AND FAIR HEARING.

We now turn to considering the allegations by the investor-owned utilities and by MMWEC that the department violated provisions of G. L. c. 30A governing State administrative pro-cedure. We are not persuaded that the department violated these provisions, as argued by the petitioners.

The investor-owned utilities first argue that the department's decision was issued on unlawful procedures because the depart-ment allegedly failed to give "sufficient notice of the issues involved to afford them reasonable opportunity to prepare and present evidence and argument." G. L. c. 30A, § 11 (1) (1984 ed.). They claim more specifically that the department did not give notice that it intended to consider the merits of their individual financing applications (particularly questions of need, financial impact, and rate effects) in the generic order or

to impose rate making conditions for financings in that order. The strength of the assertion is undermined by two factors. The petitioners jointly requested that the department conduct an investigation of the cost and schedule to complete Seabrook I, and the department issued an order indicating it would open a proceeding to investigate Seabrook I's estimated completion costs, estimated completion date, and its estimated operating characteristics. The petitioners also asked that the department render findings of fact in the individual financing applications. Secondly, the department chairman stated on December 27, 1984, in the generic proceeding that the parties were being asked to address in their briefs "the question of how to incorporate the results of this case into . . . the individual financing cases," especially if the department were unable to make specific findings on those factors or if it were unable to make any findings. The chairman then specifically stated that it would be *appropriate for the parties to discuss* how the department might view the reasonably necessary standard in terms of allocating the risk between stockholders and ratepayers in light of those possibilities. Thus, the petitioners not only had notice of the scope of the hearing (which they helped to shape), but also were invited to advise the department on how to incorporate its findings (or its inability to make them) into the individual cases. The petitioners do not describe whether, and if so, how, they responded.

The investor-owned utilities have intertwined an argument contending that the department did not consider the evidence on the issues that were noticed in the individual financing cases and that the records on the need for Seabrook I, the financial impact of the project on the utilities, and the rate effect on customers were ignored. However, they do not demonstrate how such information, if evaluated, would permit a determination that the proposed financings are reasonably necessary, in light of the department's finding that "the degree of risk associated with increased costs and potential future abandonment of the project precludes a finding that the plant is reasonably necessary."

Furthermore, we do not view the order as reaching the merits of the individual financings or as erroneous for not considering the evidence available in those separate cases. The department found that the proposed individual issuances could not be determined to be reasonably necessary based on an economic analysis of the project because such analysis based on the "substantially understated" projections of cost and schedule would be meaningless. The investor-owned utilities mischaracterize the department's action as "based on the summary conclusion that the records in the individual cases are 'meaningless.'"

We conclude that the investor-owned utilities had "sufficient notice of the issues involved to afford them reasonable opportunity to prepare and present evidence and argument" within the meaning of G. L. c. 30A, § 11 (1).

MMWEC too argues that it did not receive adequate notice in the generic case to enable it to prepare and present its evidence on the issues in its separate financing case. It also contends that in purporting to decide the financing issues (in the generic case), the department disregarded factors critical to that determination: the economics, need, and financial and rate impact for MMWEC's participants; disregarded its notice provisions; and foreclosed consideration of the economic analysis MMWEC had presented. Thus, MMWEC believes it was prevented from presenting and arguing this evidence. It concludes that the department violated G. L. c. 30A, § 11 (1), and its procedural rules requiring that notice disclose the nature of the hearing (220 Code Mass. Regs. § 1.06[5][b] [1978]; St. 1975, c. 775, § 17) as well as MMWEC's rights to due process. MMWEC supplements the argument by alleging that the chairman's invitation of December 27, 1984, did not put it on notice that, if the department could not make findings in the generic case, it would terminate the financing case, and asserts that the statement was ambiguous, too late, and contradicted "every prior notice."

We do not agree. MMWEC had the benefit of participation in the request for the generic proceeding. We read the chairman's statement as indicating concern about how to incorporate

395 Mass. 836                                    847

Fitchburg Gas & Electric Light Co. *v.* Department of Public Utilities.

findings from the generic case into the separate financing cases. We do not consider the order in the generic case to constitute a determination of the complex questions at issue in the financing case because we are persuaded by the department's statement that, because it found the petitioners' cost and schedule estimates to be substantially understated, any economic analysis it might make would be meaningless and that, without them and absent assurances that the public would be protected, it could not approve the financings. The department, therefore, was unable to perform the review. It neither determined the issues in the financing case (without regard for the evidence presented therein) nor inappropriately prevented MMWEC from presenting that evidence in the generic case.

III. THE DEPARTMENT'S DECISION: BURDEN OF PROOF; STANDARD OF REVIEW.

Our review of the evidence and our disposition of the related arguments are guided by a cluster of principles.

First of all, because the petitioners could proceed with the proposed financings only in amounts determined by the department to be reasonably necessary (G. L. c. 164, § 14; St. 1975, c. 775, § 17), they had the burden of presenting, in support of their applications, evidence sufficient to enable the department to make those essential determinations. *Fitchburg I, supra* at 678. In fulfilling its responsibility the department had wide latitude in the admission of evidence (*AAA Movers* v. *Department of Pub. Utils.*, 354 Mass. 390, 393 [1968]) and in the determination of credibility (*Framingham* v. *Department of Pub. Utils.*, 355 Mass. 138, 146 [1969]). Once it rendered a decision the department was required to supplement it with a statement of reasons, including a determination of each necessary issue of fact or law. G. L. c. 30A, § 11 (8) (1984 ed.). See *School Comm. of Chicopee* v. *Massachusetts Comm'n Against Discrimination*, 361 Mass. 352, 355 (1972) (duty to make subsidiary findings of fact on all issues relevant and material to the ultimate issue and to describe the manner in which it reasoned from those subsidiary facts to the ultimate decision). See also *Hamilton* v. *Department of Pub. Utils.*, 346 Mass. 130, 137 (1963) (right to use "'technical competence and specialized knowledge in the evaluation of the evidence' . . .

may be reflected in the specific findings" but does not make specific findings unnecessary [citation omitted]).

In light of the department's duty to make specific findings, we give detailed attention not only to the arguments alleging that the department erred in not considering evidence from the separate financing cases on such matters as energy need, alternative sources of power, financial planning, economic analysis, and rate impact, but also to the fact that the department's decision does not contain an evaluation of or findings based on that evidence. Initially, we point out that such issues are not "relevant and material" to the questions of cost, completion, and operating characteristics at issue in the generic proceeding. Although they may be "relevant and material" to the issues in the separate financing cases, we do not discern error in that context because the department did not deny those applications for reasons related to matters of energy need and alternative sources of power; but did so because "the proposed issuance . . . [could not] be determined to be reasonably necessary based on an economic analysis of the project." It decided that the economic analyses that it had intended to make in the individual financing cases would, if based on the "substantially understated" cost and construction schedule estimates, be meaningless. Under the circumstances, this is an appropriate choice by the department. Logic warrants, if not compels, its decision that determination of the threshold issues (of cost and completion schedule) obviated any need to reach the issues in the separate financing cases. As a result, we do not have the dilemma of not knowing whether the department disbelieved evidence presented in those financing cases or believed it but considered it not determinative. Cf. *School Comm. of Chicopee v. Massachusetts Comm'n Against Discrimination, supra*; *Westborough* v. *Department of Pub. Utils.*, 358 Mass. 716, 717-718 (1971).

After considering only the evidence in the generic case, the department made findings and specifically identified the failure to present a reasonable range of possible cost estimates supported by reviewable and more realistic construction schedules" and the failure "to meet their burden of providing . . . a credible

395 Mass. 836                                                    849

Fitchburg Gas & Electric Light Co. *v.* Department of Public Utilities.

analysis of the potential costs of the project." Notwithstanding the emphasis on the inadequacies of their presentation, the petitioners argue that the department's determination is not supported by substantial evidence. We may set aside a department decision which is not so supported. G. L. c. 30A, § 14 (7) (*e*) (1984 ed.). Although the standard (substantial evidence) is not easily defined, it is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6) (1984 ed.). See *Boston Edison Co.* v. *Department of Pub. Utils.,* 393 Mass. 244, 249 n.8 (1984). We are to give due weight to the "experience, technical competence, and specialized knowledge" of the department. G. L. c. 30A, § 14. Here the burden is on the petitioners to show that the order is invalid. G. L. c. 25, § 5. We believe, as the ensuing discussion demonstrates, that a reasonable mind would consider that the evidence before the department supports its determination that the petitioners had not met their burden of proof. See *Deacon Transp., Inc.* v. *Department of Pub. Utils.,* 388 Mass. 390, 395 (1983).

The petitioners relied in substantial part on the testimony of William Derrickson, the senior vice president of New Hampshire Yankee Division of Public Service Company of New Hampshire (PSNH), who represented that specific project milestones were achievable, based on his engineering analysis, his management plans, his experience in managing the construction of another nuclear power plant, and his personal familiarity with Seabrook I.

The department reviewed the information provided regarding the achievement of certain milestones in the construction of the plant and determined that the date for achieving one (the "cold hydro" test) was supported by an adequate analysis of each major task. However, it considered the information supplied regarding achievement of subsequent milestones to lack the necessary level of detail, although that had been requested, to permit appropriate review. Material with that level of detail did not exist but was being developed. The department determined that, without the information, it was impossible to verify Derrickson's ability to achieve the schedule he had

developed; that the establishment of a schedule without a greater level of supporting detail generated questions as to whether the schedule represented a realistic evaluation of the remaining work; and stated that the petitioners had presented unreviewable assertions that achievement of certain milestones was attainable. It noted that other than Derrickson's judgment there was "insufficient project-specific, detailed engineering analysis at the task level" to permit a conclusion that the portion of the construction schedule (between the cold hydro and hot functional milestone) was reasonable. Moreover, it concluded that, if it were to rely on industry experience as a guide to Seabrook's likely completion date, it could not accept the August, 1986, estimate. The department then examined Derrickson's experience as project manager of another nuclear power plant to determine whether that would support his schedule for Seabrook I but found there to be significant differences between the two plants, so that the view that the schedule for the other plant is achievable for Seabrook was not acceptable. It also reviewed information on recent work at Seabrook I in light of Derrickson's schedule and found that the schedule was not being achieved.

The department therefore concluded that the August, 1986, completion date offered by the investor-owned utilities through Derrickson was unsupported on the record. It found the earliest reasonable completion date to be August, 1988, and that there was a substantial likelihood, given industry experience and Seabrook's history, of its being later.

The department also reviewed construction costs and financing costs for Seabrook I. The petitioners relied on the testimony of Derrickson, who stated that it could be built for a total cost of $4.5 billion, based on an in-service date of August, 1986. The department found that, because substantial portions of the projected schedule were insufficiently detailed to permit review of its reasonableness, it was also precluded from making a detailed evaluation of the reasonableness of the construction cost estimate. It decided that, because both the completion date and the construction cost estimate were "overly optimistic," Derrickson's estimated allowance for funds used during construction was also understated.

395 Mass. 836                                      851

Fitchburg Gas & Electric Light Co. v. Department of Public Utilities.

Thus, the department found that the petitioners had failed to meet their burden of providing a credible analysis of the potential costs, as well as the completion date, of the project. The department specifically viewed the evidence in the context of the extremely disappointing past history of the project[10] and it was justified in so doing. On review, we believe that a reasonable mind would perceive the evidence as supporting the department's finding that the petitioners had not met their burden of proof.

IV. CONSTITUTIONALITY OF THE ORDER.

The investor-owned utilities and MMWEC allege that the order deprives them of their right to due process, Fitchburg and MMWEC contend it violates the contract clause, and Fitchburg argues that it denies it equal protection and confiscates its property.[11] We reject each challenge.

*Due process.* The investor-owned utilities allege violations of procedural due process requirements in the department's "deciding issues in the generic case that were addressed in the financing cases" and by its introduction of "ratemaking issues into its determination without benefit of notice, evidence or argument." We have explained earlier our view that the department properly concluded that it could not conduct meaningful

---

[10] The department incorporated information revealing a pattern which is reflected in this excerpt:

Unit 1

| Date of Estimate | Estimated Cost ($ millions) | Estimated Commercial Operation Date |
|---|---|---|
| Feb. '72 | 486 | Nov. '79 |
| Dec. '76 | 1007 | Nov. '81 |
| April '80 | 1527 | April '83 |
| Dec. '82 | 2540 | Dec. '84 |
| April '84 | 4100 | Feb. '86 |

[11] We assume for purposes of this analysis, without deciding the extensively briefed question, that MMWEC, although "a body politic and . . . a political subdivision of the commonwealth" (St. 1975, c. 775, § 2), may raise questions about the constitutionality of the order. See *Trustees of Worcester State Hosp.* v. *The Governor, ante* 377 (1985); *Spence* v. *Boston Edison Co.,* 390 Mass. 604, 607-610 (1983).

economic analyses in the individual financing cases because the petitioners had not met their burden of proof as to cost and schedule. Thus, we do not believe that the department decided financing case issues in the generic case. We need not respond to the second challenge, that regarding the introduction of rate making issues, because the investor-owned utilities did not accept the proffered conditions for proceeding with the financings. Thus the investor-owned utilities' due process challenges fail.

*Impairment of contracts.* Fitchburg and MMWEC each challenge the order as violative of the contract clause, U.S. Const., art. I, § 10, cl. 1.[12] Fitchburg alleges that the order significantly impairs its ability to perform its obligations under the JOA and that the impairment renders the order invalid because it is not necessary and reasonable to serve a broad societal interest. It suggests that the department should have chosen to protect those interests in the rate-setting process after completion of the project. MMWEC identifies its inability to issue long-term bonds, enter the short-term debt market, issue bond anticipation notes, transfer funds from one project to another, and to bill its participants directly for the cost of construction as indicating the extent to which the order has impaired its contracts. It also cites the suspension of its bond rating, the deprivation of alternative sources of funds to meet its JOA obligations, and the possibility that municipalities will be deprived of needed energy. It argues that a balancing of the consequences of the order against its alleged benefits demonstrates that it is not reasonable and necessary to serve the State's purposes.

We decline the invitation to engage in extensive preliminary skirmishing on significant questions and, for purposes of analysis, make these assumptions: (1) that the order is a law within the meaning of the contract clause; (2) that it does impair contractual obligations of Fitchburg and MMWEC; and (3) that the impairment is substantial.[13] We are guided in our

---

[12] "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

[13] "[T]he first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co.* v. *Spannaus,* 438 U.S. 234, 244 (1978).

395 Mass. 836                                          853

Fitchburg Gas & Electric Light Co. *v*. Department of Public Utilities.

analysis by a recent opinion of the United States Supreme Court in *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983), which stated that the facially absolute prohibition of the clause "must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people,'" quoting *Home Bldg. & Loan Ass'n* v. *Blaisdell*, 290 U.S. 398, 434 (1934), in which the Court balanced the language of the clause against the State's interest in exercising its police power. See *Exxon Corp.* v. *Eagerton*, 462 U.S. 176, 190-191 (1983). If we assume that there is a substantial impairment, we then consider whether the order is based upon a significant and legitimate public purpose such as the remedying of a broad and general social or economic problem. See *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co., supra* at 411-412. We conclude that it is. The department specifically referred to its responsibility to protect the public from the risks of financing investments not shown to be reasonably necessary. See *id.* at 416-417 (exercise of police power to protect consumers against price escalation); *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge, ante* 535, 555-557 (1985) (action by health commissioner a reasonable and permissible impairment of plaintiff's contractual obligations). Having identified a legitimate public purpose, we consider whether the adjustment of the rights and responsibilities of Fitchburg and MMWEC is based on reasonable conditions and is of an appropriate character. *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co., supra* at 412. "[A]n impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 25 (1977). Here, the department gave the investor-owned utilities the opportunity to proceed with the financing, subject to their granting certain assurances (which it could not extend to MMWEC), and indicated its willingness to permit MMWEC to issue bonds to mitigate the adverse consequences of rate shock. It acknowledged that the companies might have other options, not requiring departmental approval, which would enable them to expend funds on Seabrook I. MMWEC has not

demonstrated an absolute absence of alternative financing routes. We know of no prohibition against the petitioners' returning to the department with another financing request, perhaps based on what they consider to be a more persuasive presentation. Thus, the order is not permanent in nature. We also note that the order operates in an area subject to G. L. c. 164 at the time the contractual obligations were undertaken;[14] and it is not directed solely at Fitchburg and MMWEC. Cf. *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 250 (1978). The State may act for the general good of the public although contracts previously entered into may be affected. *Manigault* v. *Springs*, 199 U.S. 473, 480 (1905). Contracts are made subject to this power. *Marcus Brown Holding Co.* v. *Feldman*, 256 U.S. 170, 198 (1921). The department's responsibility to protect the public is not necessarily subject to prophetic preemption through the execution of a contract. See *Home Bldg. & Loan Ass'n* v. *Blaisdell*, 290 U.S. 398, 440 (1934); *Producers Transp. Co.* v. *Railroad Comm'n*, 251 U.S. 228, 232 (1920).

We therefore conclude, having examined the nature and purpose of the order, that it does not constitute a violation of the contract clause because it is reasonable and necessary to serve an important public purpose. See *United States Trust Co.* v. *New Jersey, supra* at 22-23 ("As is customary in reviewing economic and social regulation . . . courts properly defer to legislative judgments as to the necessity and reasonableness of a particular measure").

*Equal protection.* We now consider Fitchburg's argument that the department violated its equal protection rights by stating that it would "permit MMWEC to issue only . . . bonds . . . [it finds] are reasonably necessary to mitigate the adverse consequences of . . . rate shock associated with its investment to date . . .", while denying all financing for any purposes for Fitchburg, Canal, and New England. We reject the argument

---

[14] The JOA was executed as of May 1, 1973, and has been amended many times. General Laws c. 164, which predates the JOA, has not been materially revised since that date.

because MMWEC is different from the investor-owned utilities in at least two relevant respects. The rates paid by municipal light department customers as a result of participation in an MMWEC project are not subject to departmental review. Thus, the department does not have any opportunity, as it would with Fitchburg, Canal, and New England in a rate setting context, to consider ameliorating the impact of any rate shock. Secondly, MMWEC has no stockholders, other than its ratepayers, to decide whether the risk of continued participation in a project is warranted and, if so, to bear a portion of the risk. We conclude that the equal protection challenge to the department's decision fails because the distinction "rationally 'furthers a legitimate State interest.'" *Shell Oil Co.* v. *Revere,* 383 Mass. 682, 690 (1981), quoting *Opinion of the Justices,* 368 Mass. 857, 865 (1975). *Exxon Corp.* v. *Eagerton, supra* at 195-196.

*Confiscation of property.* Fitchburg also argues that the department's order confiscates its property. It alleges that the department has denied it any access to capital necessary to run the company unless it either voluntarily defaults on its Seabrook I obligations or agrees to unlawful rate making conditions. It reinforces the argument by reporting that the need to continue with construction in order to provide safe and reliable service without being able to capitalize past construction expenditures unrelated to Seabrook I has forced it to extend its short-term borrowing, cut and then omit dividends and defer payment of obligations, and states that these steps have harmed its ability to attract capital and jeopardized, as well, its ability to provide reliable services to its customers. In support thereof, Fitchburg has filed with the court a series of affidavits.

To the extent that Fitchburg presents a claim of confiscation, it is entitled to an independent review of both fact and law. *Boston Edison Co.* v. *Department of Pub. Utils.,* 375 Mass. 1, 9 (1978), and cases cited. Yet that independent review does not extend to subsidiary findings and the department action is to be examined with the presumption of validity ordinarily attaching to it. *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.,* 377 Mass. 282, 301 (1979), and cases cited.

Even if we assume that confiscation may occur in a non-rate setting proceeding, we conclude that the order is not confisca-

tory. First of all, we have concluded that there is no error in
the finding by the department that the petitioners did not meet
their burden of proving that Seabrook I is reasonably necessary.
The department's order specified that each investor-owned util-
ity's application would be denied unless certain assurances
were filed. Thus, the order was not an absolute prohibition.
Nor is it necessarily permanent. Fitchburg may choose to apply
again for Seabrook I related financing. It is conceivable that,
upon remand (see part VI, *infra*), the department might approve
some or all of that portion of Fitchburg's application related
to non-Seabrook I financing. The department states that the
order does not preclude rate proceedings which could consider
the adequacy of the rate of return. Moreover, we take notice
of an order filed with the court in D.P.U. 84-49 in which the
department, on May 21, 1985, approved and authorized the
issue and sale by Fitchburg of up to $10,000,000 of long-term
notes to be used for the retirement of short-term debt, or non-
Seabrook I related capital expenditures, or both. We do not
know to what extent this option may alleviate Fitchburg's finan-
cial problems. Nor do we conclude that Fitchburg has identified
in the financial data available in this case information on which
we may base a conclusion of confiscation. We are not persuaded
on this record that Fitchburg has no option or that those it has
are inadequate.[15]

V. ESTOPPEL AND RELATED CONCEPTS.

We now turn to the argument by the investor-owned utilities
that because they acted in reliance on prior department decisions
the department is estopped from denying financing for expen-
ditures incurred prior to issuance of the generic order, and to
MMWEC's similar contention that, because it relied on prior
department approval in entering into contracts which created
ownership obligations, issuance of the MMWEC bonds must

---

[15] This claim of confiscation is not assisted by the assertion that if Fitchburg
were not to meet its JOA obligations it might incur significant liabilities.
It is incongruous indeed for the petitioners to advance such arguments in
light of the fact that for all that appears and all the petitioners proved, the
contract may not have anything other than deleterious if not calamitous
impact on the fiscal condition of the petitioners.

be authorized as reasonably necessary. First of all, we do not consider the department's reasonable exercise of its authority under G. L. c. 164, § 14, or St. 1975, c. 775, § 17, to be subject to amendment through contract by those it is intended to govern. In addition, if ever we were inclined to apply principles of estoppel to public utilities, we should certainly not do so in a case such as this where application of those principles would tend to negate requirements of law intended to protect the public interest. *Phipps Prods. Corp. v. Massachusetts Bay Transp. Auth.,* 387 Mass. 687, 693 (1982), and cases cited. Cf. *Selectmen of Topsfield v. Department of Pub. Utils.,* 267 Mass. 343, 349-350 (1929).

MMWEC also asserts that it is entitled to but has not had the benefit of "reasoned consistency" in the department's decisions. It asserts that the department did not adhere to certain guidelines which have limited its inquiry in the past. The department acknowledged that its level of review must be more detailed where "extraordinary circumstances raise serious questions regarding the efficacy of the purpose for the financing or the adequacy of management's decision-making process." It then recited what it considered to be those extraordinary circumstances, which include the substantial cost increases and the delays in the completion dates, as well as the "large proportion of the Companies' capitalization associated with one . . . project" and the magnitude of MMWEC's financing request. We believe that the department exercised its authority appropriately and met its responsibility.

Fitchburg charges the department with having been unwilling to address in the order the consequences of Fitchburg's nonpayment of its JOA obligations, with ordering Fitchburg "out of" Seabrook I, and with making it illegal for Fitchburg to continue payments to the project. It predicted that, as a consequence, it may by now be engaged in litigation which would threaten its financial integrity. Fitchburg assumes, as we are unwilling to do, that the department knew in advance that the utility would reject the offered conditions, that Fitchburg would not use other means of making its payments, that it would not return to the department with a more persuasive case, that non-

payment would prove to be a default under the JOA, and that the order would be the sole cause. The department sought to ameliorate the impact of its order. It did not order Fitchburg "out" and did not make it illegal for Fitchburg to make future payments. The department fulfilled its duty under G. L. c. 164, § 14. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils., supra* at 678. Moreover, as we noted, "A proceeding pursuant to G. L. c. 164, § 14, is meant to serve as a screening mechanism 'to shield the public from the effects of management's unchecked discretion in the limited realm of capital spending projects that are so large in relation to the company's internal funds as not to be sustainable without external financing.'" *Id.* at 678-679, quoting *Pennsylvania Pub. Util. Comm'n* v. *Philadelphia Elec. Co.,* 501 Pa. 153, 161 (1983). Moreover, the department correctly indicates that neither the language of the JOA nor the reasonableness of future participation by the investor-owned utilities in Seabrook I were questions directly presented by the parties or addressed by the department. The department also had to weigh the competing harm to ratepayers. We do not hold the department, under these circumstances, to the level of clairvoyance suggested.

We briefly respond to Fitchburg's assertions that the department ignored the effect of a loss of any rights to Seabrook I on its ability to find and finance alternative power sources and that the court should not defer to the department because it did not review or make findings about Fitchburg's financial condition. The department, with input from Fitchburg, defined the scope of the proceeding now under review and, as discussed earlier, fulfilled its responsibility. The petitioners did not meet their burden of proof.

VI. NON-SEABROOK I FINANCING.

We lastly consider one question which necessitates that certain individual financing cases be remanded. The investor-owned utilities allege that their applications included requests for approval of long-term securities to finance construction unrelated to Seabrook I, to finance recent plant additions, and to refinance matured long-term notes issued prior to involve-

ment in Seabrook I. The department's order in the generic case does not refer to non-Seabrook financing requests. We note that they did not come within the defined scope of the generic proceeding. However, the department did order that its findings and determinations be incorporated into the individual financing requests and stated, as noted at the outset, that it would deny each such request unless it received certain assurances. Those assurances were not provided. Thus, the proceedings in the individual cases were terminated. Yet, we do not have separate findings by the department regarding the reasonable necessity of any financing for non-Seabrook I purposes or concerning the ability of the utilities involved to satisfactorily segregate the proceeds to preclude their use for Seabrook I obligations. Performance of our appellate review responsibility is hindered and, as a result, we remand the individual finance requests of the investor-owned utilities (D.P.U. 1656, 1657, 84-49, 84-84, 84-140) for resolution of the questions regarding the reasonable necessity of the proposed non-Seabrook issuances and the utilities' ability to satisfactorily segregate the proceeds.[16]

VII. CONCLUSION.

We appreciate the concerns expressed by the petitioners about the possible impact of the order on their ability to provide service, on consumers, and on the future of Seabrook I. Nevertheless, our review is shaped by the record before us. The petitioners did not meet their burden of proof. The department appropriately found, therefore, that it was *unable to reach a finding* that Seabrook I is reasonably necessary. It did not

---

[16] We need not give detailed attention to the assertion that "Canal's *entire* financing is solely to reduce short term debt incurred as a result of purchasing its affiliate's Seabrook ownership share, as *ordered* by the department in D.P.U. 518" (emphasis in original). First of all, Canal's treasurer testified that the proceeds would be "used to repay short-term borrowings incurred *primarily* for the purpose of temporarily financing construction of the Company's ownership interest in Seabrook Unit I" (emphasis added). In addition, we read the order in D.P.U. 518 as approving a purchase and sale on request of the parties, not as directing acquisition of the interests.

determine that Seabrook I is not necessary, and that issue is not before us.[17]

Judgments are to be entered in the county court affirming the orders of the department in so far as they relate to the generic proceeding and the portions of the financing applications concerning Seabrook I, and remanding the financing applications of the investor-owned utilities to the department for further consideration, findings, and decision in so far as they concern non-Seabrook financing.

*So ordered.*

---

[17] The department stated: "In reaching this conclusion, it is neither our intention nor . . . our desire that this Order be the direct cause of a termination of construction and the abandonment of Seabrook I. Our disposition . . . results directly from our responsibility to protect the public from the risks of financing utility investments which have not been shown to be reasonably necessary."